The action stood continued nisi after the argument, and at the following March term in Suffolk, the opinion of the Court, (except the Chief Justice and Thatcher,„ J., neither of them having been present at the argument, and Sewall, J., dissenting,) was delivered as follows by
Sedgwick, J.
There are several objections made, as reasons why judgment should not be rendered on the verdict found in this case.
The first, as I understand it, is founded on the unusual terms of the policy, as descriptive of the voyage insured. The insurance, in this respect, is certainly unusual; and, as far as I know, altogether singular. It is a valued policy on the brig Liberty, her cargo and outfits,-" at and from Salem to any port or ports, place or places, backwards and forwards, round the globe, one or more times, during her stay and trade at all such places, until her return to her port of discharge in the United States.”
It is said that this description is so loose and indefinite, that it does not come within the principle that the commencement and termination of a voyage insured must be expressed in the policy. This *267 rule is deduced, as I understand, from the doctrine laid down by Molloy, (B. 2, c. 7, § 14,) that if a ship be insured from London to --, (a blank being left to prevent a surprise by an enemy,) and in her voyage, she happen to be cast away, although there be private instructions for her port, yet the insured must sit down by the loss, by reason of the uncertainty. And to this principle it is understood that the usage of merchants has conformed.
* I think the doctrine of Molloy is sound and reasonable; but I do not think that this is a. case within it. Here the commencement and termination of the voyage are expressed. The commencement is “ at and from Salem,” and the termination is the “ port of discharge in the United States.”
It is said that, according to this understanding, the insurance would continue during the life of the vessel; and that this could not be the meaning of the parties. But why could it not ? It is to be remembered, that during the intermediate time, it was the duty of the assured to keep the vessel tight, stanch, and strong; and that if she should become unfit, from a want of sea-worthiness, to commence and perform any voyage she might undertake, the underwriters would be discharged. Upon this condition, which attaches to every contract of this kind, the defendants were willing to assume the risk they did, at a premium of nine per cent, per annum. And I see nothing, in the nature of the transaction, why it was not competent for the parties to enter into such a contract; and more especially, when it is considered that the insurance on the “ cargo and outfits,” when the outward cargo was broken up, would cease to be a valued, and would become an open policy.
It is further said that the voyage insured must be understood as intending a voyage to take seals; and when that business was accomplished, to return to the United States. — If such were the intention, it might and ought to have been expressed; whereas, in the words the parties have used, there is nothing from which such an intention can be collected, but the contrary. Instead of such a voyage, the assured were at liberty to go “ to any port or ports, place or places, backwards and forwards, round the globe one or more times.”
It was further insisted that from the whole evidence it is manifest that it was known to the parties, that one object of the voyage, at least, was the taking of seals in the south seas. This is admitted; and it is said that the arrival at Prince Edward’s Islands, the intended place of this business, *the latter part of May, or the beginning of June, being the winter season in that latitude of the globe, was an improper season, and that this *268 manner of performing the voyage discharged the underwriters. I assent to the principle, on which this objection is founded. It is, that in contracts of insurance, the voyage is to be performed in such a manner, that the underwriters are responsible for no extraordinary risks, which were not contemplated, and which may be unnecessarily incurred. I am not sufficiently acquainted with the facts, to determine whether that was the case in this instance; but I think it is a sufficient answer to this objection, that this purpose of the voyage was known; that the policy was dated the 30th of October, when it is to be presumed the vessel was at Salem, preparing for her voyage; and that she sailed in the ensuing November. The time of her sailing, then, and her consequent arrival at her port of destination, cannot be objected to by the defendants; as they must be presumed to understand the circumstances of the voyage insured, and to assume the ordinary risks attending it.
Another objection made to the plaintiff’s right to recover is, that there was a deviation. This objection, as to the strict, literal meaning of deviation, was in this case hardly possible; for, as has been already shown, the assured were protected by this policy in going to all ports and places, backwards and forwards, and round the globe, as often as they pleased.
But it is said, here was delay, in the nature of deviation, which will avoid the policy. — It is difficult to conceive how mere delay, or sailing in one direction more than another, when the assured had a right to sail any where, should discharge the underwriters. This insurance, as to its termination, was not an insurance upon time; for it was to terminate whenever the brigantine should arrive in the United States. It was not an insurance of any definite voyage or voyages. It was anomalous, — authorizing the assured to go to any and every part of the globe; and *in every place equally protecting the property, wherever it might be, unless greater than ordinary danger was unnecessarily incurred. Such a case seems to exclude the possibility of a deviation merely by delay, or by sailing in pursuit of any unlawful commercial object.
But in this case I do not perceive any unnecessary delay. After being unsuccessful in the endeavor to take seals, on Prince Edward’s Islands, they sailed for the Crozette Islands; but, after searching a month, were unable to find them. There is no evidence, by which it can be inferred, that this was owing to the ignorance or want of skill of the master. The residue of the time, until the brig sailed for the Isle of France, was consumed in regaining Prince Edward’s Islands, after being blown off, and in attempts *269 to get water, and to find men, who had been sent on shore for that purpose.
Another objection arises from a note at the bottom of the policy, by which the underwriters were to be exempt from “ any loss that might take place for illicit or contraband trade, with or by any person whatever.”
It would be impossible to get over this objection, did the case rest solely on the capture, and the decree of the Court of Vice Admiralty at Colimbo. But that decree, which condemned the vessel for carrying on illicit trade, was reversed by the Court of Appeals in England, and restoration ultimately decreed; so that there is a final decree, in a court of the captors, that the charge of illicit trade could not be supported, as a ground of condemnation ; and this is a conclusive answer to this objection.
The last objection is, that the leaving of the papers at the Isle of France (which is said to have been the cause of the capture) was the fault of the master; and that for this the underwriters are not responsible.
The question, whether the want of papers was the cause of the capture, was not ascertained by the jury; it not being put to them. But from the facts, which are reported, there is reason to believe that to be the case. There is no * suggestian of any fact, from which it can be inferred that the capture was for any other cause. The want of papers was noticed by the commander of the frigate; and although he appeared to be satisfied on this point, by the account which the master of the brig gave of the cause of the accident by which the papers were lost, yet the suggestion of the lieutenant, that Columho was in the way to Bombay, and that it might be best to send the brig in for examination, seems to have no other foundation than the want of papers. When the brig was carried in, she was, contrary to the expectation of the commander of the frigate, condemned.
The important papers, which were left behind at the Isle of France, were the sea-letter and the register; for I make no account of the Mediterranean passport. The sea-letter specifies the nature and quantity of the cargo, the place from which it comes, and its destination. The register is the evidence of property, and shows that the vessel really belongs to a neutral country. Although, by the law of nations, the want of documents, which are usually provided for vessels, and ought to be on board of them, will not amount to conclusive evidence against a vessel’s neutrality, because not absolutely inconsistent with it; yet prudence requires that they should always be at hand, when necessary to prevent a capture from a *270 suspicion, which may justly be excited by a want of them. For even Hubner (Part 1, c. 3, <§> 10) admits that the proof of property, which in this case is the register, is so essential to every neutral vessel for the prevention of frauds, that those which sail without it have no reason to complain, if they are interrupted in their voyages tad their neutrality disputed.
There was, then, in this case, a reasonable ground of capture; although, as is proved by the final decree, there was none of condemnation. There is great reason to believe that this capture was for want of papers; and if that excuses the underwriters, it is important that it should be ascertained; and that question depends upon this, whether a capture for want of papers, which might be and ought * to be on board, is within the contract of insurance as a peril insured against ?
The only loss, for which a remedy is sought in this case, was occasioned by the capture; and in deciding on the merits of the action, it is proper that we should assume it as a fact, that the capture was occasioned by the want of papers, provided that will discharge the underwriters. For that purpose the case ought to be sent to a new trial, because at present we are ignorant of a fact, material to be known to decide on the merits of the cause.
The rule of construction in this case is laid down by Park (4) with great accuracy. He says, “ Although courts in this case, as in all others, will endeavor to give effect to this species of contract, by a liberal and equitable construction, yet they will be cautious not to extend the principle of construction so far as to say that the acts of the parties shall be made to operate beyond their intention; and therefore they will attend to the words of the contract, and see that the loss, which has proved to have happened, is really one of those risks against which the underwriter has insured.”
Let it be again remembered that the ground, on which we pro ■ ceed in this investigation, is that the capture, which is the cause of the loss, was in this case occasioned solely by the want of papers, which had been in the possession of the master, and which, through his neglect, were left behind at the Isle of France. It cannot be pretended that this neglect is a risk escpressly insured against. It is not a peril of the sea; it is not a detention by a superior force ; it is -not an assailing of thieves, nor any other risk assumed by the insurer; and if it rests upon him, it must be by implication resulting from the nature of the transaction.
It is the duty of the owner to see that he intrusts the property *271 insured with a man of competent skill, prudence, and discretion. He is responsible for all losses or damage to the goods committed to his charge, which arise from his negligence, ignorance, or wilful misconduct; and, as he is * responsible to the owner in all such instances, the underwriter is not in any of them, excepting only in such cases of wilful misconduct as amount to barratry, when that is specially insured against by the underwriter. Now, it was owing solely to the negligence of the master, in the case under consideration, that the papers were left behind at the Isle of France; and the consequence seems irresistible, that if that was the cause of the loss, the underwriters are not responsible.
The principle of an implied warranty on the part of the assured, that every thing shall be done to prevent a loss, pervades the whole subject of marine insurance; or, in other words, that the insurer shall be responsible for no loss, but such as is occasioned by some of the perils, which, according to a fair construction of the contract, was in the understanding of the parties insured against. Hence is the principle, that the insurer shall answer for no loss resulting from the gross negligence or ignorance of the master, or from the want of a competent crew; hence, also, the insurer is not liable for any loss or damage, which may happen to goods from any fault or defect of the ship, not arising from the violence of the wind or sea, or from an accident or misfortune in the voyage, but from some latent defect before she sailed; hence, too, there is an implied warranty that the ship shall proceed in the usual and common route, and therefore a deviation from it discharges the underwriter.
To show the obligation which rests on the assured, his duty in the case of a ship warranted neutral is remarkable, and analogous to the case before us. In such case it is a settled rule, that the assured, in order to comply with his warranty, must not only maintain the property to be neutral, but so conduct himself towards the belligerent parties, as not to forfeit his neutrality. He must pursue the conduct, and preserve the character of a neutral; and for that purpose must furnish himself, and keep in his possession, the ordinary evidence of his neutrality ; unless * deprived of it by some inevitable misfortune. Now, I cannot distinguish that case from this, as to the obligation which rests on the assured.
To show with what strictness the assured are holden to perform whatever is incumbent on them, as means of safety to the property insured, the case of Law vs. Hollingsworth (5) is directly in point. *272 In that case the loss happened in sailing up the River Thames. No pilot was taken on board; and it was determined that this neglect discharged the underwriters; although it did not appear that the loss was directly imputable to a want of skill in those who navigated the vessel; because the assured cannot recover, unless they equip the ship with every thing necessary to her during the voyage. The great principle, on which every case of this kind ought to turn, is laid down in that case very concisely and perspicuously, by the court. Lord Kenyon said, that “ the assured cannot recover on a policy of assurance, unless they equip the ship with every thing necessary to her navigation during the voyage ; the ship herself must be sea-worthy ; she must have a sufficient crew, and a master and pilot of competent skill.”
The case under consideration is much stronger than that of Law vs. Hollingsioorth, inasmuch as in that the negligence of the captain was not the cause of the loss, but in this, but for the negligence of the master, no loss would have happened, (a)
The case of Rich vs. Parker (6) was determined on the same principle. — In that case the ship was ' warranted to be American property. She was so in fact. She had not on board a passport, as required by the treaty between the United States and France; and although the ship suffered no inconvenience for the want of such passport during the voyage, yet it was determined that not having it on board discharged the underwriters. The same principle had previously governed the decision of the court in the case of Barzillai vs. Lewis, (7) as it did also in that of Farmer vs. Legg. (8)
* I will mention only one case more — that of Denison vs. Modigliani. (9) After the ship and cargo were insured, the assured requested of the underwriters leave to take out a general letter of marque. This was refused, but afterwards taken out. The court decided that this avoided the policy, although the loss was not occasioned by it. It is true, that this decision is called in question by Marshall, (10) and perhaps with good reason. He does not, however, deny the principle upon which it was determined, *273 but its application. The principle is, that the assured shall do nothing, by which the risk insured against shall be increased ; bui Marshall thinks that the taking out of the letter of marque did not increase the risk.
By these cases, the respective duties of the underwriters and the assured seem to be clearly pointed out. The underwriter is to indemnify for any loss, which fairly takes place from any of the risks insured against; and the assured is to see to it, that the insurer is exposed to nothing beyond those risks ; and that they shall not be increased b.y his own misconduct or negligence, or that of the master or crew. And the underwriter in those cases is discharged, although the misconduct or negligence is not the cause of the loss.
This principle governed all the cases which I have cited or referred to upon this point. They are, therefore, much stronger than the case before us; for here the negligence of the master, in leaving the papers at the Isle of France, was the cause, and the sole cause, of the loss.
There were two cases cited in the argument, which were supposed to be in opposition to the rule, which I have endeavored to establish. In the case of Dawson vs. Atty, goods were insured on board a certain ship generally by her name, without any addition of country, and she was not represented to be of any particular country at the time the policy was subscribed; although she was in fact an American. * It was determined, that it was not necessary that she should be documented as such; and that in case of capture by a foreign state, for want of the documents required by a treaty between that state and her own, the owner of the goods may recover against the underwriters. In that case it was evident, that the neutrality of the vessel was not a consideration with the underwriter, who was willing to assume the risks independently of that circumstance, and there was no opinion of the court why he should not be holden by his contract.
In the case of Elting & Al. vs. Scott & Al., the court, although they did not incline to give a decisive opinion, were inclined to believe, that when the national character of a vessel is not warranted or represented, it is not incumbent on the assured to show that he had a sea-letter, or other papers required by the laws of the country, or by treaties with foreign nations. Even an inclination of opinion by that court is entitled to respect; but it is sufficient to observe, that the case referred to differs widely, in its prominent features, from the case before us. Here the inquiry is, whether a loss, which was occasioned solely by the negligence of the master, be a loss for which the underwriters are responsible, as being a risk *274 insured against. I cannot think it is, and am therefore of opinion that there should be a new trial, (a)

New trial ordered.

Note. After the above opinion was pronounced, Sewall, J., observed, that he did not concur therein, but thought it unnecessary then to give at large the reasons of the opinion he entertained in the cause, as the action might, probably, come again before the Court, after the new trial should have been had

Í4I Page 61, 62.

 7 D. & E. 160.

а) [The case of Law vs. Hollingsworth did not proceed on the ground of negligence, but of unseaworthiness. (1 Marsh. Ins. 3d ed. p. 160.) In Rich vs. Parker, and Barzillai vs. Lewis, the warranty was not complied with by the assured. (1 Marsh. 412 .—420.) In Farmer vs. Legg, the ship was not navigated according to law. (1 Marsh. 171, 3d ed.) Denison vs. Modigliani was decided on the ground that the risk had been changed, or altered, after the execution of the policy, without the consent of the underwriters. (1 Marsh. 285, 3d ed.) — Ed.]

б) 7 D. & E. 705.

 Park, 358. — Marsh. 323, S. C.

 7 D. & E. 186.

 Marsh. 194.

 Marsh. 194,195.

 [The rule, that a loss, the proximate cause of which is a peril insured against, is a loss within the policy, although the remote cause may be negligence of the master or mariners, has been affirmed, both in the English courts and in the highest judicial tribunal in the United States. — The Petapsco Ins. Co. vs. Coulters, 3 Peters, 230. — Busk vs. The Royal Assurance Co., 2 B. & A. 73. — Bishop vs. Pentland, 7 B. & Cr. 214. — 1 M. & R. 49, Show vs. Robberts, 1 N. & P. 279. — Dobson vs. Sotheby, 1 M. & M. 90. —Ed.]