WILLIAMS (SMITH v.). See Case No. 13,-127.

WILLIAMS (SOHIER v.). See Cases Nos. 13,159 and 13,160.

WILLIAMS (STEVENS v.). See Cases Nos. 13,413 and 13,414.

WILLIAMS (STOWELL v.). See Case No. 13,515.

## Case No. 17,738.

### WILLIAMS v. SUFFOLK INS. CO.

[3 Summ. 270;[1] 1 Law Rep. 153; 1 Hunt, Mer. Mag. 159.]

Circuit Court, D. Massachusetts. May Term, 1838.

JURISDICTION OF COURTS — QUESTIONS IN DISPUTE WITH FOREIGN NATION — SOVEREIGNTY OF TERRITORY—REVOLUTIONARY GOVERNMENTS — SHIPPING — AUTHORITY OF MASTER — SEIZURE BY USURPED AUTHORITY — RECAPTURE — SALVAGE—INSURANCE—ABANDONMENT.

1. Where a dispute exists between two independent countries, as to the right of sovereignty over a particular territory, the courts of justice of each country are bound to consider the claim of their own government as rightful, and are not at liberty to discuss the question who is the rightful sovereign, it being a subject of political and diplomatic negotiation, and not of judicial cognizance.

[Cited in Luther v. Borden, 7 How. (48 U. S.) 57; In re Cooper, 143 U. S. 503, 12 Sup. Ct. 460.]

[Cited in Re Gunn, 50 Kan. 232, 32 Pac. 954.]

2. Therefore, where the question, whether the government of Buenos Ayres had sovereign jurisdiction over the Falklands or not, was in dispute between the United States and Buenos Ayres, and the United States maintained that it was not; it was held, that the American courts were bound by the acts of its own government; and that, consequently, a condemnation of an American ship by a Buenos Ayrean tribunal, for illicit trade with the Falkland Islands, was illegal, and void for want of jurisdiction.

3. The Falkland Islands were formerly a part of the vice-royalty of La Plata, or at least were so claimed by Spain; and the government of Buenos Ayres (a new revolutionary government) has no right to assert sovereignty over them. unless those islands have been acknowledged to be within its territorial jurisdiction.

4. Semble, that the master of a ship is not absolutely bound to break up his voyage upon a usurped authority, and an illegal threat of a foreign government to confiscate the ship and property. if he persists in carrying on the voyage. He may exercise his discretion on the subject: and is not guilty of barratry, or gross misconduct, in persisting in the voyage. even though the ship should be seized and condemned therefor.

[Cited in Orient Mut. Ins. Co. v. Adams, 123 U. S. 73, 8 Sup. Ct. 71.]

5. If a ship is seized under such usurped authority, and recaptured by the crew, they are entitled to salvage; and the decree of an American court in rem will be deemed conclusive on the right. unless fraud is shown.

[Cited in brief in Ellicott v. Alliance Ins. Co., 80 Mass. 319.]

6. Where. in consequence of such an illegal seizure. and recapture. the voyage is lost, the owners may abandon for a total loss.

[1] [Reported by Charles Sumner, Esq.]

7. If the immediate cause of a loss is a peril insured against, it is no defence, that it was remotely caused by the negligence of the master or crew.

8. On commercial questions, the courts of the United States are not bound by the decisions of the state courts.

[Cited in Gloucester Ins. Co. v. Younger, Case No. 5,487; Greely v. Smith, Id. 5,-750.]

Assumpsit on a policy of insurance, dated the 19th of August, 1830, whereby the plaintiff caused to be insured by the defendant, for nine per cent. per annum, premium, warranting twelve per cent. "lost or not lost, forty-nine hundred and nineteen dollars, on fifteen sixteenths of schooner Harriet, and eighteen hundred and seventy-five dollars on board said vessel, at, and from Stonington, (Connecticut), commencing the risk on the 12th day of August instant, at noon, to the Southern Hemisphere, with liberty to stop for salt at the Cape de Verd Islands, and to go round Cape Horn, and to touch at all islands, ports, and places, for the purpose of taking seal, and for information and refreshments, with liberty to put his skins on board of any other vessel or vessels until she returns to her port of discharge in the United States. It being understood, that the value of the interest hereby insured, as it relates to this insurance, is not to be diminished thereby. It is understood and agreed, that if the Harriet shall not proceed south-easterly of Cape Horn on a voyage toward the South Shetland Islands, and there be no loss, then the premium is to be six per centum per annum, the assured warranting only nine per cent." Vessel valued at five thousand dollars, outfits valued at two thousand dollars. There was a similar policy underwritten by the defendants for the plaintiff, on the same day for the like voyage in all respects, of thirty-five hundred dollars, on the schooner Breakwater, and two thousand dollars on outfits on board, at the same premium; the vessel being valued at thirty-five hundred dollars, and the outfits at two thousand dollars; upon which also an action was brought. The declaration upon each policy averred a total loss, by the seizure and detention of one Lewis Vernet and other persons, pretending to act by the authority of the government of Buenos Ayres, with force and arms. The causes came on to be heard together by the court, upon certain facts and statements agreed by the parties. It appeared from these facts and statements, that both of the vessels insured were bound on a sealing voyage, and proceeded to the Falkland Islands in pursuance thereof, and were there both seized by one Lewis Vernet, acting as governor of those islands, under the appointment and authority of the government of Buenos Ayres. The Harriet was seized on the 30th of July, 1831, and was subsequently carried by the captors to Buenos Ayres, where certain proceedings were had against her in the tribunals and under the sanction of the government of Buenos Ayres. She has never

been restored to the defendants; but has been condemned for being engaged in the seal trade at the Falkland Islands. The Breakwater was seized at the islands, on or about the 18th day of August, 1831, and was afterwards recaptured by the mate and crew, who remained on board, and was by them brought home to the United States; and after her arrival, was libelled for salvage in the district court of Connecticut district, and salvage was awarded of one third part of the proceeds of the vessel and property. Copies of the orders and decrees of the court of Buenos Ayres respecting the seal fisheries; of the appointment of Vernet as governor of the Falkland Islands; of the proceedings against the Harriet; of the correspondence of the American government with the Buenos Ayrean government respecting those seizures, and the claims of the Buenos Ayrean government to the jurisdiction of the Falkland Islands, were produced and read de bene esse in the case.

C. G. Loring, for plaintiff.
Theophilus Parsons, for defendant.

STORY, Circuit Justice. I do not think it necessary, in the present cases, to examine many of the points made by the learned counsel on either side; because, in my judgment, the whole controversy turns upon a point, which, if decided in favor of the plaintiff, will render the examination of all others wholly unimportant. The government of Buenos Ayres insists, that the Falkland Islands constitute a part of the dominions within its sovereignty, and, consequently, that it has the sole jurisdiction to regulate and prohibit the seal fishery at those islands, and to punish any violation of its laws by a confiscation of the vessels and property engaged therein. On the other hand, the American government insists, that the Falkland Islands do not constitute any part of the dominions within the sovereignty of Buenos Ayres; and that the seal fishery at those islands is a trade free and lawful to the citizens of the United States, and beyond the competency of the Buenos Ayrean government to regulate, prohibit, or punish. The controversy is still undisposed of by the two governments, each maintaining its own claims and pretensions, and neither admitting the claims or pretensions of the other. In this state of the diplomacy between the two countries, while the whole matter is in contestation between them, or, as we may say, flagrante lite, the question is, whether it is competent for this court to reëxamine and decide, in its judicial capacity, upon the claims and pretensions of the two governments, and thus to interpose its positive umpirage to settle the matters in dispute, at least to the extent required for the proper adjudication of the cases now before it.

My judgment is, that this court possesses no such authority; and that it is bound up by

the doctrines and claims insisted on by its own government, and that it must take them to be rightful, until the contrary is established by some formal and authorized action of that government. It is very clear, that it belongs exclusively to the executive department of our government to recognise, from time to time, any new governments, which may arise in the political revolutions of the world; and until such new governments are so recognised, they cannot be admitted by our courts of justice to have, or to exercise the common rights and prerogatives of sovereignty. This doctrine was fully recognised by the supreme court of the United States, in Gelston v. Hoyt. 3 Wheat. [16 U. S.] 246, 324, as indeed it had been before, in City of Berne v. Bank of England, 9 Ves. 347: Dolder v. Bank of England, 10 Ves. 353, 11 Ves. 583; and The Manilla, Edw. Adm. 1. Now, before the revolution in South America, it seems to be historically true, that the Falkland Islands were, if they were under the positive dominion of any power, a dependency of Spain, under the vice-royalty of La Plata. When Buenos Ayres separated itself from the government of Spain, it might have claimed the sovereignty also of the Falkland Isands as an appendage to its own dominions. But that claim, unless enforced by an actual possession, and a full recognition by other nations, could, in no just sense, be deemed to give a fixed title. Buenos Ayres has undoubtedly been recognized by the government of the United States as an independent government; but that recognition can by no means be extended to an admission of its title to the sovereignty of the Falkland Islands, unless some act of the government can be shown, which carries it to that extent. None such is shown; none such is pretended. On the contrary, our government has expressly denied the sovereignty of Buenos Ayres over those islands, while it has admitted its territorial sovereignty on the continent of South America. And, upon the principle already adverted to, a principle well founded in the acknowledged doctrine of the law of nations, the Falkland Islands must be deemed to belong to their old sovereignty (whatever it might be), until the title of Buenos Ayres has been admitted by our government. This short view of the matter seems to me to dispose of the main subject in controversy; for if Buenos Ayres had no legitimate sovereignty over those islands, the act of seizure of the Harriet and the Breakwater was a gross usurpation; and the decree of its tribunals upon the subject of the seizure of the Harriet was a mere nullity, utterly unfounded in point of jurisdiction.

But I wish to add a word or two more on this subject, upon a principle somewhat broader in its extent, and equally applicable to, and decisive of, the merits of this case. It is, that this court, in its judicial character, cannot entertain political questions of this nature; or settle the rights and claims, as to territory and sovereignty, in controversy between us and foreign nations. On the contrary, this court is bound, so far as its own functions are concerned, to act upon the ground, that the claims of our government, and its assertions of its rights in this respect are correct. "Omnia rite acta." It might otherwise happen, that the extraordinary spectacle might be presented, of the courts of a country, disavowing, and annulling the acts of its own government in matters of state, and political diplomacy. The true doctrine on this subject was laid down by the supreme court of the United States in Foster v. Neilson, 2 Pet. [27 U. S.] 253, 307, and it was fully acted upon at the last term of that court, in the case of Garcia v. Lee, 12 Pet. [37 U. S.] 511.

Upon these grounds, this court must hold both of these seizures unlawful, and therefore the plaintiff is entitled to recover, as for a total loss, in the case of the Harriet.

In regard to the Breakwater, there is no pretence to say, that there has been a total loss, for which the underwriters are responsible. Upon the recapture the voyage was capable of having been performed; at least, the contrary is not established. The only question, which remains is, whether the underwriters are responsible for the salvage decreed by the district court of Connecticut. I am of opinion, that they are.—In the first place, the decree, upon the principles established in Gelston v. Hoyt, 3 Wheat. [16 U. S.] 324, 311 to 322, is conclusive, that the salvage was due and properly awarded; and that decree, there being no pretence of any fraud, is not re-examinable in this collateral proceeding. In the next place, if that decree were re-examinable, here is no question, that it was rightfully a case for salvage; for the recapture saved the vessel and outfits from an imminent peril of condemnation. The conduct of the Buenos Ayrean government clearly shows that there was imminent danger of confiscation of the property; and not the less so, because, in the view of our government, the seizure was unlawful; since Buenos Ayres insisted upon it, under a claim of rightful sovereignty, to enforce a supposed violation of that right. The principles decided by the supreme court in Talbot v. Seeman, 1 Cranch [5 U. S.] 1, fully sustain this claim for salvage.

I have not thought it necessary to discuss at large the points suggested by the learned counsel for the defendants, that the loss was occasioned by the barratry or gross negligence of the master of the Harriet, in carrying on the seal fisheries at the Falkland Islands, after the alleged warning given to him by Governor Vernet. Assuming that such a warning was given, I do not think that it could in the present case change the rights of the defendants. There is no ground for deeming the master's conduct to be barratry; for it was not any fraudulent violation, or wilful abandonment of his duty to the owner. As to the point of gross negligence, not amounting to fraudulent conduct, if such a case were made out, it would not help the defence. It has

been repeatedly settled by the supreme court of the United States, that if the immediate cause of a loss is a peril insured against, it is no ground of defence, that it was remotely caused by the negligence of the master or crew; the rule being, "Causa proxima, non remota spectatur." See Patapsco Ins. Co. v. Coulter, 3 Pet. [28 U. S.] 222; Columbian Ins. Co. of Alexandria v. Lawrence, 10 Pet. [35 U. S.] 507; Waters v. Merchants' Louisville Ins. Co., 11 Pet. [36 U. S.] 213. This doctrine being founded, not upon local law, but upon the general principles of commercial law, would be obligatory upon this court, even if the decisions of the state court of Massachusetts were to the contrary; for upon commercial questions of a general nature, the courts of the United States possess the same general authority, which belongs to the state tribunals, and are not bound by the local decisions. They are at liberty to consult their own opinions, guided, indeed, by the greatest deference for the acknowledged learning and ability of the state tribunals, but still exercising their own judgment, as to the reasons, on which those decisions are founded. But I do not understand, that the supreme court of Massachusetts has adopted any positive doctrine inconsistent with the principles of the maxim above stated. On the contrary, in Delano v. Bedford Ins. Co., 10 Mass. 347, 354, that learned court fully recognised the rule, that the immediate, and not the remote, cause of a loss was to be regarded in policies of insurance. I am aware of the decision of the same court, in Cleveland v. Union Ins. Co., 8 Mass. 308; but considering, that the ultimate decision was made by a minority of the court, (Mr. Chief Justice Parsons and Mr. Justice Thacher not sitting, and Mr. Justice Sewall dissenting) it can hardly be considered as a satisfactory authority. See, also, Ellery v. New England Ins. Co., 8 Pick. 14, 22.

But if the law were otherwise, nothing but very gross and criminal negligence of the master would bring the case within the category of the argument. Now, here is the case of a trade lawful, as I am bound to maintain, to American citizens, and rightfully carried on by them. Under such circumstances, and especially taking into consideration the past uninterrupted state of that trade, it seems too much to say, that a mere fear of molestation in the trade would have justified the master in breaking up the voyage. The underwriters were bound to know the ordinary perils of the trade, as much as the owner of the ship; and they took upon themselves the ordinary risks, arising from the known claims and decrees of the Buenos Ayrean government, known, I am to presume, as much to one party to the insurance, as to the other. I cannot say, that the master did not exercise a fair and reasonable discretion; or that his conduct was marked with such rashness, precipitation, and gross negligence, as to amount to a desertion of his proper duty, or to exonerate the underwriters from their liability. He appears to

have acted with good faith, under a sense of duty, and in a lawful manner, in the maintenance of the rights of his country. Assuming that he had knowledge of the threats of Governor Vernet to make a seizure, if he persisted in pursuing the seal fishery at the Islands, he might have deemed it, and undoubtedly did deem it, a mere brutum fulmen, a threat, intended for intimidation, and not for execution; and the more so, because it was a gross usurpation of jurisdiction and sovereignty. Indeed, it is a very grave question, whether a master is bound to abandon his legal rights, and to submit to an unjustifiable exercise of illegal authority; and whether, if, in consequence of his refusal, a seizure, manifestly unlawful, should take place, whereby the vessel is 'lost, the underwriters would be discharged, even though the master might by a more prudent course, and by abandoning the voyage, have avoided the seizure. At present I incline strongly to the opinion, that he is not, in such a case, bound to abandon his legal rights, unless, indeed, his conduct would amount to a criminal departure from duty. The case of Sewell v. Royal Exchange Assur. Co., 4 Taunt. 856, appears to me fully to support this doctrine. In that case, the master refused to submit to what was deemed an illegal order of the governor of St. Michaels, and his vessel was seized and condemned therefor; and that was the cause of loss averred in the declaration. On that occasion Lord Chief Justice Gibbs, speaking for the court, said: "We think each party stands on his strict rights; and we are now to consider the strict point of law, not the question, whether it would have been more prudent in him, the master, to go to Tercera (according to the order), but whether he acted bona fide. We do not, however, quite agree with the defendants on the question of imprudence. But it is for the underwriters to shew, that the owners did something, which made it legal for the Portuguese to seize and condemn the vessel. And unless the seizure is legalized by any illegal act done on the part of the owners by the captain, the seizure is illegal, as we think, that here it is, and the assured is entitled to recover." There is great good sense in this doctrine: and I do not well see, how, upon any other rule, a master could safely act either for himself, or for his owners, in emergencies of this sort. If, upon every threat of illegal violence or seizure, he were bound to abandon his voyage, or the legal rights of the owner, there would be an end of all security to trade and commerce. It seems to me, therefore, that upon principle there is great reason to hold, if the loss is occasioned by the illegal act of a foreign government, it is a loss within the perils of the policy, even though it might have been avoided by the master by a different course of conduct, if his actual conduct was bona fide, in furtherance of the objects of the voyage, and in pursuance of his duty to his owners.

Upon these considerations my judgment is,

that the plaintiff is entitled to recover for a total loss in the case of the Harriet, and for a partial loss (i. e. the salvage,) in the case of the Breakwater.

[NOTE. As the judges were opposed in opinion, the cause was certified to the supreme court, where it was held that, inasmuch as the American government insisted that the Falkland Islands do not constitute any part of the dominions of Buenos Ayres, the action of the American government on this subject is binding on the circuit court, and that the plaintiff is entitled to recover for the loss of the Harriet. 13 Pet. (38 U. S.) 415.

[For hearing upon the report of the assessor who was appointed to report whether there was a necessity for the loss of the Breakwater, see Case No. 17,739.]

Note [from 1 Law Rep. 153]. The case of Cleveland v. Union Ins. Co., 8 Mass. 308, was never retried; but the loss was paid by the underwriters, it having been understood that Mr. Chief Justice Parsons expressed a decided opinion against the underwriters, and recommended a settlement.