## ST. VICTOR BARRETT *v.* GENERAL MUTUAL INSURANCE COMPANY OF NEW YORK.

THIS case should have followed that of the same Plaintiff *v.* The New Orleans Insurance Company of New Orleans. Ante p. 3. It is inserted here, because the argument for a re-hearing has been deemed of sufficient importance to be published.

EUSTIS, C. J. (*Rost*, J., absent.) This is an action on another policy on goods shipped on board the schooner W. C. Preston. The facts are established in the same manner and to the same extent as in the other cases. For the reasons given in the case of *Lapeñe, & Ferré* v. *The Sun Mutual Insurance Co.*, [Ante p. 1,] the judgment in this case is affirmed with costs.

*Briggs*, for defendant, applied for a re-hearing.

In the sixth chapter of Arnould, 2d edition, § 243, it is stated that "in every policy of marine insurance there is an implied warranty that the ship shall be sea-worthy for the voyage, by which is meant that she shall be in a fit state as to repairs, equipments, crew, and all other respects to encounter the ordinary perils of the voyage insured at the time of sailing on it."

The reason of the rule is then given, and reference is made to the observations of *Lord Eldon*, in *Douglass* v. *Scougall*, 4 Dow. 276, and of *Lord Redesdale*, in *Wilkie* v. *Geddes*, 3 Dow. 60.

And the author proceeds to say, that "The Courts have accordingly held that the sea-worthiness of the ship for the voyage, when she sails, *is a condition precedent to the underwriters' liabilities* for any loss incurred in the voyage."

If she be not so sea-worthy, says *Lord Ellenborough*, "from whatever cause this may arise, and though no fraud was intended on the part of the assured, the underwriters may answer, "We are not liable."

At page 655—" Thus in an action brought by an innocent shipper of goods, (who had no interest whatever in the ship,) on proof being given that the ship was unseaworthy when she sailed, *Lord Mansfield* non-suited the plaintiff, saying that the implied warranty could not be dispensed with in any case, and that is now well understood to be the law of England on this subject." *Oliver* v. *Cowley*, Park on Ins., 470, 8th London Edition.

He then proceeds: "The proposition indeed 'that the implied warranty of seaworthiness cannot be dispensed with in any case,' though unquestionably true as a general rule, must yet be understood with some limitations; for the following case shows, that if a ship having originally sailed in an unseaworthy state, puts back immediately on discovering the defect, *and the underwriters* agree to waive the objection, *and allow her to proceed on her voyage a second time*, (on which occasion she sails seaworthy,) they cannot afterwards set up the plea of her original seaworthiness as a defence against any subsequent loss totally unconnected therewith." Which brings us to the case of *Weir* v. *Aberdeen*, 2 B. & A., 320, and which we shall now proceed to examine.

We must first, however, in order to test the force of this and other cases, establish our definitions.

*Seaworthiness for the voyage* does not attach title till she sails, says *Mr. Justice Lawrance*, *Annan* v. *Woodman*, 3 Taunt.

Of course, if she ultimately sails unseaworthy for the voyage, this according to the rule laid down, wholly discharges the underwriter from all liability for loss on the voyage, although the policy may have *attached* on her while "at" the

BARRETT
v.
GENERAL MUTUAL
INS. CO. OF N. Y.

port, owing to her having been *there* seaworthy for her *then* risk.   *Partee* v.
*Potts*, 3 Dow. 27.   Per Park, arguendo in *Watson* v. *Clark*, 1 Dow. 336, cited .
Arnould, 2, 674–5.

This warranty according to the law of England, is satisfied if the ship *sails* in a seaworthy condition—the assured makes no warranty that the ship shall continue seaworthy in the course of it.   *Lord Mansfield* in *Berman* v. *Woodbridge*, Doug. 758.   *Lord Mansfield* in *Elden* v. *Robinson*, Doug. 755, cited by Arnould, p. 657.

The *second description of seaworthiness* is that for port or inland navigation. There are in fact different degrees of seaworthiness.   Seaworthiness for the *voyage* is one thing; and seaworthiness in port or for inland navigation, &c., quite another.   *Forbes* v. *Wilson*, Park on Ins., 472, 8th London edition, and Arnould, page 673, § 249.

This then is the doctrine of the English tribunals, and is the law of England now, and was in 1819, when *Lord Tenderden* as Chief Justice of the Court of King's Bench, delivered his opinion in *Weir* v. *Aberdeen*, and it is quite impossible that he and his associate Judges should be entirely unacquainted with the subject which we are compelled to believe if his declaration that he "was a little surprised at the proposition," be not considered to have reference to that which was in fact the turning point in the case.

The report is somewhat meagre, but it begins thus : "Action upon a policy of insurance, dated 21st Feb., 1817, on the ship Prince Cobourg, and her outfit at and from London to Bahia ; *and the declaration stated that the* following memorandum of the 5th April, 1817, was endorsed upon the policy.   *It is agreed, that the Prince Cobourg may load, unload and reload goods, and discharge part of her cargo at Ramsgate.*   Plea non-assumpsit.

It is needless to narrate the facts which are of course well known to the Court, and are set out in the opinion.

It was objected on the part of the defendant that the ship having been overladen, was unseaworthy at the commencement of the voyage, and *that the memorandum was invalid*, for want of *a new stamp*, and also from having been obtained without making a due communication to the underwriters.   The learned Judge (*Best*) however was of opinion, "that this being a policy on ship, the risk *had commenced before any goods had been laden*, and he left two questions to the jury ; first, whether, when she sailed from Ramsgate, she was properly laden, and in a seaworthy state ; and secondly, whether the subsequent loss had been occasioned by the circumstance of the vessel having been overladen between London and Ramsgate."   The Jury found that she was seaworthy *when she sailed from Ramsgate*, and that the subsequent loss had no relation to her unseaworthiness between London and Ramsgate, and a verdict was entered for plaintiff.

Now the Court will find in the opinions refusing a rehearing, that the attaching of the policy whilst the ship was in port and before loading, was considered as avoiding the necessity of a new stamp, the policy not having failed ab initio, and the defect being cured by the waiver of the objection, the original stamp was sufficient ; and although the opinion of *Best* in the report is not set out, it was of course on this ground that he considered it material.   It legalized the contract which by the memorandum was considered as commencing at Ramsgate.

On the motion for a new trial, it was again urged, 1st, that her having sailed in an unseaworthy condition, was a breach of a condition precedent ; and 2d, "that supposing the policy to have attached, the putting into Ramsgate was a deviation ; *for the memorandum could not avail the plaintiff, inasmuch as it operated as a new policy, and therefore required a new stamp*, and the liberty there given was obtained from the underwriters without having disclosed the important fact that the vessel had strained much owing to her having been overladen, or that a protest had been made."

We now come to the opinion of Chief Justice *Abbott*, who says : "It appears in this case that the vessel at the time of her departure was not in a fit condition to perform her voyage, in consequence of her having at that time a greater cargo than she could conveniently or perhaps safely convey.   The master having discovered this, and having met with bad weather, (which was perhaps the cause of the discovery being ever made,) put back into the Downs, *and having obtained permission to go into Ramsgate for the purpose of discharging part of her cargo, went there and did land some portion*, and so having removed the objection that had previously existed, put the ship into a fit condition to perform the voy-

age, and the Jury have found that the loss which subsequently happened, was in no degree attributable to the condition in which she had originally sailed, and from which she had freed herself by discharging part of her cargo at Ramsgate. *But it is said that this memorandum expressing the consent of the underwriters is void,* and that in order to bind the underwriters, a new contract was necessary, inasmuch as the fact of the vessel having once sailed with a cargo greater than was proper for that voyage, and therefore in an unseaworthy state, *wholly put an end to their liability on the policy.* That proposition would go the length of establishing that if a vessel at the outset of the voyage be by mistake or accident unseaworthy, owing to some defect which is immediately discovered and remedied before any loss happens in consequence of it, still the policy would be void and the underwriters not liable. I confess that I was a little surprised at that proposition, because if true in point of law, I fear we should find many cases indeed, where it would turn out that the assured could have no claim upon the underwriters, because something was wanting, or something excessive at the instant of the ship's departure, although the want had been supplied or the excess removed before the loss happened. Suppose for instance a vessel is unseaworthy, unless she has two anchors, being destined for a long voyage, and she sails from London to Gravesend with only one, shall it be said that if no loss happens between London and Gravesend, and the vessel at Gravesend takes on board her second anchor and then proceeds on her voyage, that the underwriters are *not liable for a subsequent loss, and that the policy is completely at an end, that even if the underwriters agree to waive the objection, and to allow her to proceed on her voyage, then consent shall be unavailing.* These inconveniencies which would be continually occurring in practice, would lead to dangerous consequences, by opening the door to the underwriters to break their engagements by means of trivial circumstances, the effect of which no one can contemplate. *I think, therefore, the proposition cannot be maintained.* As to the objection that this was a deviation, it is sufficient to answer that it was done by the permission of the underwriters *with respect to the communication made to them,* it was *quite clear that the underwriters were told all that was in substance necessary for them to know,* for they were told *that when the vessel sailed she had too large a cargo on board, and that she was not in a situation fit to perform her voyage. Upon the whole, therefore, I think that the rule must be refused.*"

We would now ask, what were the propositions before the Court? We take them to be those stated on the application for a new trial. First, *that the policy never attached ;* and that if it did, *the putting into Ramsgate was a deviation, because the memorandum endorsed on the policy was void, inasmuch as it operated as a new policy, and therefore required a new stamp ;* and because important facts were not disclosed to the underwriters.

Now we have seen that on the trial, *Best,* J. held, that being on *the ship,* it did attach, because she was seaworthy for her then condition ; and as, by the memorandum, the underwriters had waived a defence, which would, but for the waiver, have availed them, the waiver by endorsement, related back to the original execution of the contract, and did not constitute a new contract, requiring a new stamp. That the consent was considered to have disposed of the plea of *deviation,* is too plain to require illustration. The opinion is awkwardly expressed, but no doubt can exist in the mind of any one, it seems to us, that the whole must be construed together, and that when *Lord Tenderden* expresses his surprise at a doctrine which *was* then, and *is* now, admitted to be law, the concluding paragraph "that even if the underwriters agree to waive the objection, and allow her to proceed on her voyage, their consent shall be unavailing," must be considered as inducing the declaration, that *upon the whole,* he thought the rule must be refused.

This construction is warranted by the opinions of the other Judges. *Bayley,* J., says, *I am of the same opinion.* There was not any fraud or concealment in this case, *so as to vacate the memorandum ;* for it distinctly appears that the underwriters were told that the ship had been overloaded, and that from that circumstance *she was in an unseaworthy state.* As to the fact that the ship had strained, it is to be observed, that if that straining had rendered her unseaworthy, *the non-communication of that fact would have vacated the policy ;* but as the jury negatived that fact, it was immaterial. *The question then is,* whether the memorandum required a new stamp, and the case of *Hubbard* v. *Jackson,* 4 Taunt. 174, is an authority to show that a warranty may be waived without a new stamp. *Now it is a warranty that the ship shall be seaworthy, and therefore it*

*does not require a new stamp in order to waive it.* On these grounds, I am of opinion *that the memorandum in this case did not require a new stamp, and that the verdict is right.*"

*Holroyd,* J. "I am *of the same opinion.* I do not think that the overloading which *rendered the ship unseaworthy at the time of her sailing, made an end of the policy.* The inconveniences which have been pointed out, induce me to think that such a proposition is contrary to law; no authority has been cited in support of it; and unless some cogent authority were produced, I should not accede to it. It appears to me that the *risk continued to the term of the loss,* and that the plaintiff is entitled to recover."

Now here is authority stronger than that of the C. J., if the language is to be understood without reference to the particular facts of the case, or the quo animo with which it was employed. *Bailey,* J., is also of the *same opinion with the Chief Justice,* and yet distinctly tells you that seaworthiness is *a warranty!* and that as it has been decided that a warranty may be waived or modified at any time prior to the natural termination of the risk without a new stamp, therefore this waiver was good without a new stamp, and therefore the plaintiff was entitled to recover—in other words, that the endorsement related back to the date of the original policy, which to this extent was not destroyed; and this is all that *Lord Tenterden* ever intended to say, or that *Holroyd* or *Best* intended to say.

Had the memorandum of waiver not been there, does the Court undertake to say that the underwriters should have 'been held liable? That the breach of a warranty of seaworthiness for the voyage occurring on the departure of a ship for London, could be cured at Ramsgate! if so, why not at Madeira, or at any port short of that of her destination? and what becomes of the *general rule?* and yet if the view the Court has taken of it be correct, to this conclusion we must come. *Lord Tenterden* must be understood as declaring that a warranty once broken can be subsequently cured without the consent of the underwriters, a doctrine we are quite sure his lordship never heard broached in Westminster Hall, and are equally sure he is innocent of having originated.

The doctrine is fully and unconditionally asserted in Sergeant Marshall's treatise upon the law of insurance, the first edition of which was published in 1802, and the second in 1808, and in Mr. Justice Park's work, published in 1786. It is, as we have before observed, impossible to conceive the Court surprised, or considering this doctrine as a novelty.

That the very portion of the opinion relied on, which has been quoted by writers as establishing this novel doctrine should be considered a dictum, we should infer from the illustrations put. His Lordship talks of accidental deficiencies or excesses immediately discovered and corrected, and supposes a vessel navigating from London to Gravesend with one anchor, and there taking in the other. This is *river navigation,* and he well knew that for such a risk the seaworthiness of the voyage is not exacted, and that in the instance put, the underwriters would be bound by other principles of law. But if intended to meet the point raised at bar, *they are full of significance,* for it was argued *that the risk never attached,* that the breach of the warranty so completely avoided the contract, that the endorsement must be considered as a new acceptance of the risk, a new contract between the parties; and as such wanting a stamp to give it validity. This *Best* at the trial answered by saying that the policy *being on the ship, attached before loading;* and in this view, and with this intendment, the case put is such as might be expected from Chief Justice *Abbott,* and ceases to be inappropriate, as to our humble judgment it would be, were the popular reading of this opinion to be admitted as correct.

He never considered that these observations would, *apart from the facts of the particular case,* be construed as overturning a doctrine so completely settled, or that they would be considered in themselves decretal.

The recent work of *Mr. Arnould* has, however, accepted the result of our examination as its true exposition, since in the second edition of his work on Insurance, p. 657, he says after citing the authority: "It must be understood, however, that this doctrine is *strictly limited* to cases, in which there is clear evidence *both that the underwriters have agreed to waive* the objection to the ship's *original* want of seaworthiness, *and also* that the subsequent loss was wholly unconnected therewith.

To the English doctrine and definitions, that seaworthiness for the voyage is a

condition precedent, and satisfied if the ship sails in the required condition. And that this complete equipment is not required for port or inland navigation.

BARRETT
v.
GENERAL MUTUAL
INS. CO. OF N. Y.

The American system of jurisprudence has added a third and qualified warranty, the nature of which together with the recognition of the English as the general rule, is clearly set forth in *Starbuck* v. *New England Insurance Co.*, 19 Pickering, where the Court says: "The obligation of the assured to have his vessel seaworthy at the commencement of the voyage, and his obligation to keep her seaworthy during this voyage, depend on different considerations, and impose different duties. *If the assured does not make her seaworthy at first*, she is not a vessel. But, if she meets with an accident *after* the beginning of the voyage, as the very contract of insurance supposes that she may, it is the duty of the assured to make repairs." If he does not repair, when he reasonably ought to do so, and a loss arises from it, the assured cannot recover, because it is not a loss by any of the perils insuredagainst; but if the loss arise from another cause, he may recover. The difference is this: If the vessel is not seaworthy at first, *the policy never attaches;* in the other case, the insurers having become responsible, continue liable for all losses *not arising from the fault of the owners, &c.* See *Copeland* v. *New England Insurance Co.*, 2 Metcalf, 432, 437.— *Paddock* v. *Franklin Insurance Co.*, 11 Pick. 227, 234.

We shall now examine the American doctrine and the cases cited in support of this supposed qualification of the general rule, and will begin with *Kent*, who in speaking of this warranty, says, p. 358: "This warranty of seaworthiness *relates to the commencement* of the risk, and the warranty is not broken if she becomes unseaworthy afterwards," and then goes on to notice the American doctrine with reference to the obligation to keep the ship in this condition, and says: "A breach of the implied warranty of seaworthiness in the *course* of the voyage has no retrospective operation, and does not destroy a just claim to damages for losses occurring prior to the breach of this implied condition." "Every warranty is a part of the contract;" "it differs from a representation in this respect, that it is in the nature of a condition precedent, and requires a strict and literal performance. Whether the thing warranted be material or not, and whether the loss happened by reason of a breach of the warranty, or did not, *is immaterial, a breach of it avoids the contract ab initio.* Every condition precedent requires a strict performance to entitle a party to his right of action. But seaworthiness in port may be one thing, and seaworthiness for the whole voyage quite another."

He then, as in the case with all the writers except Arnould, takes up Weir & Aberdeen, and after stating that the general rule is that a "vessel must be seaworthy at the commencement of the risk, whatever that risk may be, in order to make the policy attach and charge the insurer," observes: "*It was held* in the case of *Weir* v. *Aberdeen*, that though a ship be unseaworthy at the commencement of the risk, yet if the defect be cured before a loss, a subsequent loss is recoverable under the policy. The argument of *Lord Tenderden* in favor of this doctrine *is very weighty*, but a doubt seems to have been thrown over its solidity by the Supreme Court of the United States, referring to 1 Peters' R. 170."

We have here the doctrine laid down as we have stated it, and the only exception cited is that of the case we have reviewed, and yet this is the doctrine which *Lord Tenderden* is supposed to have treated as novel, and as one which surprised him.

In the case referred to, Judge *Story*, in reference to the case in question, merely says: "In this point of view it is not necessary to rely on the doctrine of Mr. Chief Justice *Abbott* in *Weir* v. *Aberdeen*, *which goes the length of asserting* that if there be unseaworthiness at the commencement of the voyage, and the defect is cured before the loss, the subsequent loss is recoverable under the policy. *This is an important doctrine*, and well worthy of discussion, whenever it comes directly in judgment."

Here the Court will find the tables again changed, and both Chancellor *Kent* and Mr. Justice *Story* treating the opinion of *Lord Tenderden* as heresy, and one at which *they* might express surprise.

We shall now refer to *Mr. Phillips*, and the authorities he has cited in support of this doctrine, and see whether they are more to the point.

It is needless to refer to those which are in affirmance of the doctrine we are advocating, they will be found at p. 308, 329, second edition.

The quotation from this author, cited by the Court, we are unable to find, and it must therefore be an addition to or alteration of the text in the edition of which we have not seen.

BARRETT
v.
GENERAL MUTUAL
INS. CO. OF N. Y.          In that referred to, the 2d, he says, "That the effect of non-compliance with the warranty of seaworthiness, as well as of the forfeiture of any other condition, is to discharge the underwriters from their liability under the policy." If this condition is forfeited at the commencement of the risk, it doubtless discharges from all liability under the policy; "but it does not appear that a forfeiture of this condition, subsequently to the commencement of the risk, discharges the underwriters from their liability to pay antecedent losses; on the contrary, the underwriters are liable for previous losses;" and *Annan* v. *Woodman*, 3 Taunt. 299, and *Taylor* v. *Lowell*, 3 Mass. 347, are cited as authority.

We now come to our unfortunate case, which he introduces under the marginal heading of Temporary Unseaworthiness, and says: "Though it appears by many of the preceding cases that a non-compliance with the warranty of seaworthiness, discharges the underwriters from all subsequent liability, *yet it seems to be intimated*, in an opinion given by Chief Justice *Abbott*, that a non-compliance with this warranty may take place, and still, if the defect whereby it is violated is of a temporary nature, and soon remedied, and it appears that no loss could have occurred in consequence of the defect, the liability continues, or *revives*, notwithstanding such violation;" p. 330; and then sets out the opinion and the remark of Mr. Justice *Story*, in 1 Peters, already given thereon.

And at page 335 says: "In *Weir* v. *Aberdeen*, 'the circumstance that the policy was at and from the port, so that *the policy attached*, and the risk commenced before sailing was not expressly relied upon, or made the avowed ground of the decision; but such was the fact, and would seem to reconcile it with the decisions.'" That is, the breach was not at the commencement of the risk. This is, as we have shown, the very point in the case, if coupled with the waiver.— The fact was, as we have shown, directly decided by *Best*, and forms the leading feature in the judgment of Mr. Justice *Bailey;* and as we have endeavored to show, was the fact upon which the case depended; for had it not attached, the whole reasoning would have fallen to the ground. The argument for the plaintiff is not set out, and this may have occasioned the mistake.

The next authority is *Taylor* v. *Lowell*, 3 Mass. 331, which is introduced by the following remark: "It has, however, been distinctly held in Massachusetts, New York and South Carolina, that a temporary non-compliance with this implied warranty does not discharge the underwriters from a liability for all subsequent losses, where it distinctly appears that no damage or subsequent change of risk was occasioned by such non-compliance."

This case is somewhat of the same complexion as *Weir* v. *Aberdeen*, and Judge *Phillips* fairly states the contradictory complexion of the decree, and for the purpose of reconciling the contradiction, *infers* that it must have been decided upon the doctrine in question.

The ship was insured 12th January, 1798, lost or not lost, at and from Calcutta to her ports of discharge in the United States. The assured had advice of her arrival at Calcutta, in July, 1797, and that she would probably sail from thence in August of that year, and the insurers were so informed. She did sail on the 19th August, for the United States, but leaking badly put back to Calcutta, where she was unladen, made seaworthy, and sailed in February, 1798, from Calcutta to the United States, and arrived at Boston in safety. *Suit was brought for the premium*, and resisted on the ground that the ship sailed in an unseaworthy condition, and that as the risk had therefore never attached, no premium was earned. This was the issue raised, and why the Court undertook in its opinion to go over so much ground it is difficult to understand.

The Court correctly decided or rather exposed, that seaworthiness for the voyage is one thing, seaworthiness for the port another; that accidents chargeable on the underwriters might well happen to a ship or goods in port, and be independent of the forfeiture resulting from subsequent sailing in an unseaworthy condition; that under this doctrine, the policy in question attached, and the premiums were earned, and that the liability to this extent once attaching, was not discharged by the sailing of the ship in an unseaworthy condition, but continued through the voyage, and entitled them to call for payment on a contract of binding force upon the parties on the return of the ship to Boston. This does, it seems to us, reconcile the contradictions otherwise apparent in this opinion, and was in fact all the Court was called upon to decide, the risk attaching but for an instant, the premium was earned, and the case was at an end; and if as Judge *Phillips* thinks, the Court went further, it was an exposition of law gratuitously given by the Court, and cannot be considered decretal.

The case of *Deblois* v. *The Ocean Insurance Company*, 16 Pick. 303, is not in point. The risk was at and from Boston to St. Thomas, and a market in the West Indies, &c. The original warranty had been satisfied. The ship arrived at St. Thomas in safety, and it was for a breach of the continuous duty to keep the ship seaworthy imposed by the American doctrine in an intermediate voyage, that was urged as a defence. *Peabody*, J. "But there is another answer: If it were not proper to make the passage without more ballast, *yet it was no breach of the implied warranty of seaworthiness*, but a neglect to keep her in that state. And if she had been lost in consequence of that neglect, the defendants might have availed themselves of that neglect. But she made the passage in safety. The defect, if any, was cured, for it is not suggested that she was not in good sailing trim when she left the West Indies."

We leave the Court to decide whether this case is not a direct authority for our position, and whether the distinction between the warranties and the consequence resulting from their breach, could be more distinctly pointed out.

The case of the *American Insurance Company* v. *Ogden*, 15 Wendall 532, 20, 287, is equally inapplicable. It was a time policy for six months. The vessel sailed the 26th November, on a voyage from New York to Charleston, thence to Norfolk, and thence to St. Thomas, in the West Indies. *There was no pretence that the original warranty was broken.* She sailed seaworthy from New York, but in going into Charleston lost her small bower anchor, and failed to replace it; and encountering bad weather, sprung her foremast, and became leaky.

The case of *Chase* v. *The Eagle Ins. Co.*, 5 Pickering, 52, is still inapplicable. Assumpsit on a policy of insurance upon property on board the Delia, at and from New York to Lynn, with liberty to call at Newport. The ship sailed on the 13th or 15th December, from New York, with an underdeck and deck load, and proceeded to Newport, where she arrived the next day, and unloaded her deck load.

We subscribe to every principle advanced in this opinion, but are unable to see in what possible way it can be cited as authority against us. The vessel complied with her warranty, and sailed in a seaworthy condition, and thus the warranty was fulfilled. She went into her port under the permission to do so, and had she been there made unseaworthy by the willful neglect or ignorance of the master, the American doctrine continuing the obligation to maintain her in that condition, would, as the Court has said, have avoided the contract; but the jury found that he had not done this, and the Court sustained the verdict.

*McMillan & Ewart* v. *Union Insurance Company of Charleston*, 1838, is extracted from the Charleston Courier, February 26, 1839, we are therefore obliged to take it as it is given in the text, and can only say that if correctly reported, it is in violation of a principle established by the highest authorities in an infinite variety of cases.

*Cleveland* v. *Union Insurance Company*, 8 Mass. 308, is the last case cited as illustrating this subject, and proof of the adoption in Massachusetts, New York and South Carolina, that a temporary non-compliance with this implied warranty does not discharge the underwriters from a liability for all subsequent losses, where it distinctly appears that no damage or subsequent change of risk was occasioned by such non-compliance, and we have found it as little applicable to the subject as the rest.

There is no allegation that the ship was unseaworthy at the commencement of the voyage, and the only approximation to the subject is, that it was contended that the neglect of the captain to take his papers with him from the Isle of France. Now admitting this to have been the case, it was still a breach of the continuous obligation to keep the ship in a state of seaworthiness we have so often adverted to, and not that breach of the warranty which is held to be a condition precedent.

The case mentioned by the Court having reference to the needle, we suppose that cited, p. 310, *Stanwood* v. *Rich*, S. J. S. Mass. Suff. November, 1817, turned altogether upon another point. If Judge Phillips' statement be correct, it was shown by a variety of witnesses, that notwithstanding the utmost care of master and owners, iron-bodies will sometimes occasion a variation, and there being no negligence, the Court did not consider the ship unseaworthy, seeming to acquiesce in the opinion of the witnesses. .

We have gone through all the cases cited by Judge *Phillips* with some degree of minuteness, because we were sensible that it was our duty to rest our objec-

14

BARRETT
*v.*
GENERAL MUTUAL
INS. CO. OF N. Y.

tion to the decision of the Court on other grounds than our mere assertion that the cases were not in point; we have, we believe, shown that they are not, and we beg to assure the Court that in the analysis of each we have honestly reported them without the slightest endeavor to dress them to our purpose. It may be still as Judge *Phillips* says, a settled rule of American jurisprudence, but it must be shown on other grounds and supported by other authorities than those he has adduced.

We believe that it is not so—that he, like other writers, has been misled by the case of *Weir* v. *Aberdeen*, and that he has, in endeavoring to find analogous cases, confounded the American doctrine of *continuous*. obligation with the initiatory condition to which that case undoubtedly has reference.

The principles established in the case 15 and 20 Wendell, were recently and fully discussed, and resulted in the same decision in *Small* v. *Gibson*, first tried in B. R., and afterwards in error in the Exchequer Chamber, reported English Law and Equity Reports, vol. 3, and the leading doctrines as we have explained them, are fully recognised as applicable alike to policies for time and voyage, and it seems to us that the Court should pause before it undertakes to overturn a doctrine which has been admitted to be true for centuries, even upon one or two state decisions which may or may not have been properly presented or determined, if such are to be found, and we have found none.

We would, however, again repeat our conviction, that had not the master of the W. C. Preston, when he left for the Bay of St. Louis, ordered her to follow him, she never would have left her moorings until his return. We have asked this question of merchants and seamen, and have received the like answer. We repeat that it is impossible to believe that a schooner, navigated by three men and a cook, should, in the absence of her captain, break up from her moorings, and proceed to sea, on her voyage to Galveston; and this is sworn to by the witness, examined under a commission, who says that they did not sail for the Bay of St. Louis, but for Galveston.

The inference is irresistible, that she left her moorings, and went to sea to pick the captain up; and if this be the fact, it is unnecessary to tell the Court that it was a deviation. The master says he boarded the schooner twenty miles from the Bay of St. Louis, and that he was on board when he discovered the loss of the water. This may be, but we do not believe it; and are satisfied, that on the ground of deviation, as well as from the fact that she went to sea in an unseaworthy condition, the underwriters are discharged. Wherefore we pray that the case may be re-argued at bar.

Rehearing refused.