BENJAMIN F. COPELAND & others *vs.* THE NEW ENG-
LAND MARINE INSURANCE COMPANY.

A vessel which is insured on a voyage out and home, and which departs with officers and a crew competent for the voyage, does not become unseaworthy by reason of the master's becoming incompetent, at the foreign port, to command the vessel ; and if the vessel sails from such port under his command, and is lost on the homeward pas sage, the underwriters are not discharged, although the loss may have been caused by the master's incapacity. WILDE, J. dissenting.

And although, in such case of the master's incompetency, it is the duty of the mate to take command of the vessel, and although he has a right to resort to all lawful means to establish himself in the command ; yet if, from want of judgment, or even from culpable negligence, he omits so to do, and the vessel sails under the master's com-mand, and is stranded, the underwriters are not discharged. WILDE, J. dissenting.

AŚSUMPSIT on a policy of insurance dated August 8th, 1836, upon the brig Adams, Joseph Gillespie, master, for a voyage from Wilmington, in North Carolina, to Jamaica, in the West Indies, and back to a port of discharge in the United States. The brig was wrecked at Point Este, on her passage from Ja-maica to the United States, and wholly lost.

The case was tried before *Wilde,* J. at the March term 1839, and the defence was put on the several grounds of barra-try in the master, deviation, and unseaworthiness of the brig, as hereinafter mentioned in the opinion given by the chief justice.

After a verdict was returned for the defendants, and before judgment, the plaintiffs moved that the verdict might be set eside, and a new trial granted : " Because the judge, who

presided at the trial, directed and charged the jury that if from sudden sickness, insanity or intoxication, they should believe that the master, at the time said brig left Jamaica, was unfit or incompetent to have command of said brig, then they should find for the defendants, notwithstanding it was fully proved that the master, at the commencement of the voyage, and always before, had been skilful, sane, and temperate ; and notwithstanding there were on board all the other officers and crew, suitable for such a vessel and such a voyage, and of competent skill and ability. To which charge and direction the plaintiffs excepted.

" The jury returned a verdict for the defendants, on the ground that the master had suddenly become incompetent to command said brig, at the time she sailed from Jamaica, from one or all of the causes above named ; and on no other ground."

To this motion the judge appended the following statement : " The case, as stated in the motion for a new trial, is substantially correct. There was evidence tending to prove that at the time the vessel sailed from Jamaica, and for some time previous, the master, by reason of severe sickness, or continued intoxication, or some other cause, had become insane and wholly unfit to have the command of the vessel ; and that he continued in this state until the time of the loss of the vessel.

"On this evidence, the jury were instructed, that if these facts had been proved to their satisfaction, the underwriters were discharged : That it was the duty of the assured to keep their ship in a competent state of repair and equipment during the voyage, if they were able so to do ; and that, consequently, when the master became incompetent, it was the duty of the first mate to take the command of the vessel, and if resisted by the master, application should have been made to some competent authority to restrain the master, and to prevent the vessel from going to sea under his command : That as this was not done, and as the master's incompetency continued until the time of the loss, it might be reasonably inferred that the loss was the consequence of the master's mismanagement, for which the defendants were not responsible. I referred the jury to the case of *Paddock* v. *Franklin Ins. Co.* 11 Pick. 234, and laid down

the law as it is there laid down, in relation to the point in dispute.

" If this instruction was wrong, a new trial is to be granted ; otherwise judgment is to be entered on the verdict."

This case was argued at March term, 1840, by *D. A. Sim-mons*, for the plaintiffs, and by *W. D. Sohier*, for the defendants.   The opinion of the majority of the court was given on the 7th of March, 1842, by

SHAW, C. J.   The court have heretofore had occasion to consider this cause, 22 Pick. 135, but under a very different aspect from that in which it is now presented ; and the principles then decided have little tendency to aid us in considering the questions arising on this report.   And it is now a subject of unfeigned regret, that the court have not been able to come to a unanimous result.   The case has been frequently discussed, and postponed from time to time, for further consideration ; but as the judges have ultimately arrived at different conclusions, nothing remains but to declare the judgment of a majority of the court, with a statement of the reasons upon which it has been formed.

The action is upon a policy of insurance, dated August 8th, 1836, upon the brig Adams, Joseph Gillespie, master, for a voyage from Wilmington, N. C. to Jamaica, and back to a port of discharge in the United States.   The brig, on her return passage from Jamaica to the United States, was wrecked at Point Este, on the Isle of Pines, coast of Cuba, on the night of September 21st, 1836, and wholly lost.

Several grounds were taken in defence ; viz. 1. Barratry of the master, and that the vessel was run on shore intentionally. 2. Deviation.   3. That the brig was unseaworthy when she left Jamaica, by reason that the master, from sickness, insanity or intoxication, had suddenly become incompetent to have command of said brig. .

It is in regard to this last point, and the instruction given by the court in reference to it, that the principal question has arisen.

The motion for a new trial states, as one of the reasons on

which it is claimed, this : Because the judge, who presided at the trial, directed and charged the jury that if, from sudden sickness, insanity or intoxication, they should believe that the master, at the time said brig left Jamaica, was unfit or incompetent to have command of said brig, then they should find for the defendants, notwithstanding it was fully proved that the master, at the commencement of the voyage, and always before, had been skilful, sane, and temperate ; and notwithstanding there were on board all the other officers and crew suitable for such a vessel and such a voyage, and of competent skill and ability.

The judge who tried the cause reports, that the case thus stated in the motion was substantially correct ; that there was evidence tending to prove, that at the time the vessel sailed from Jamaica, and for some time previous, the master, by reason of severe sickness, continued intoxication, or of some other cause, had become insane and wholly unfit to have the command of the vessel ; and that he continued in that state to the time of the loss.   He then recapitulates the instruction given to the jury on this evidence, to this effect — that if these facts had been proved to their satisfaction, the underwriters were discharged that it was the duty of the assured to keep their ship in a competent state of repair and equipment during the voyage, if they were able so to do.   A further instruction was given in regard to the duty of the mate, in case the master becomes incompetent, which appears to us to present a separate and distinct question, which we shall recur to hereafter, and which may be better understood by a separate consideration.

The judge also reports, that he referred the jury to the case of *Paddock* v. *Franklin Ins. Co.* 11 Pick. 234, and laid down the law as it is there laid down, in relation to the point in dispute.

It is stated in the motion, which is sanctioned by the judg as a substantially correct statement of the case, that the jury found their verdict for the defendants, on the ground that the master had become suddenly incompetent to command said brig, at the time she sailed from Jamaica, from one or all the causes mentioned ; and on no other ground.

The question, presented by the case thus stated, appears to us to be this  A vessel insured, at the commencement of a voyage and at the inception of the risk, has on board a master, officers, and crew engaged for the voyage, competent in point of capacity, and sufficient in number, to navigate such a vessel upon the voyage on which she is destined, taking into consideration the length of the voyage, the climates in which she is to navigate, the season of the year, the condition of the world, and especially of the nation to which she belongs, as to war or peace, and all other contingencies.  In the progress of the voyage, the master becomes incapacitated by sickness, or otherwise, to manage and navigate the vessel, she being then at a port where a suitable person to be master might be obtained, or afterwards arriving at such a port, but no new master being employed, the vessel sails on her homeward passage, in the course of which she is lost by one of the perils insured against ; but that loss was occasioned by, or might be reasonably ascribed to, the incapacity of the master, arising from such continued sickness up to the time of the loss.  Is this a loss for which the underwriters are responsible ?

At the trial, it was stated to the jury that a vessel, so leaving an intermediate port, is not seaworthy ; that if a vessel becomes unseaworthy after the commencement of the voyage, it is the duty of the owner to put her in a seaworthy condition at the first port, or as soon as it can be reasonably done ; that if he does not, and in consequence of the want of such equipment, the vessel was or may have been lost, it is the loss of the owners and not of the underwriters ; and that inasmuch as it is necessary in the outset of the voyage to have a competent master, in order to render the vessel seaworthy, the principle stated imposes on the assured the duty of obtaining a new master, in case the original master dies, or becomes incompetent to command.

In the case of *Paddock* v. *Franklin Ins. Co.* 11 Pick. 234, an attempt was made to distinguish between that seaworthiness which must exist at the commencement of the voyage, and that seaworthiness or state of fitness and equipment, in which the vessel must be kept in the whole course of the voyage, and the consequences imputable to unseaworthiness, in the two cases.

It was considered as the well settled rule of law, that if the vessel is not seaworthy at the commencement of the voyage, the policy never attaches ; there is no insurable subject on which it can act ; the parties stand towards each other as if no such contract had been made ; and all the consequences follow, which must follow from treating such contract as a nullity. The ˙nsurer can claim no premium. The assured can claim no loss. Of course it is entirely immaterial whether the peril, by means of which the vessel was lost, was caused or increased by the defect in which the imputed unseaworthiness consists, or whether it proceeded from a cause wholly distinct.

But it was considered, that if the vessel was seaworthy at the commencement of the voyage, the policy attached ; and if the vessel should afterwards, in the course of the voyage, become unseaworthy, and the owners should neglect to put her in a seaworthy condition, after it was in their power to do so, and the vessel should be lost by any cause which could be reasonably attributed, in whole or in part, to her unseaworthiness, the underwriters might be exonerated ; but upon a very different principle from that on which they were exempted in the other case. It being settled to be the duty of the owners, even after a damage done to their vessel by one of the perils insured against, to put their vessel in a seaworthy condition — that is, in a condition fit to encounter the still future perils of the voyage — as soon and as fully as it is in their power to do so ; if they fail to do so, and if the vessel is afterwards lost under such circumstances, that the loss might be reasonably attributed, in whole or in part, to such want of repair, then the actual cause of loss is the want of repair, for which the assured are responsible, and not the sea-damage, which caused the want of repair, for which it is admitted that the underwriters are responsible. For, in determining what losses are within the perils insured against, *causa proxima, non remota, spectatur.*

In saying that the underwriters are not responsible, if the loss may be reasonably ascribed to the want of repair, it may be proper to add a word by way of explanation. Under a contract of insurance, to enable the assured to recover, the burden

of proof is upon them to show a loss by some one of the perils insured against. Amongst these perils are those arising from the extraordinary violence of the winds or seas. A vessel having sustained sea-damage, and not being repaired when practicable to do it, or imperfectly repaired, so that she is unseaworthy, sails and founders in a gale of wind. Had she been well repaired, staunch, and seaworthy, she might have weathered that storm, or even a seaworthy vessel might have sunk under it. This question may be left doubtful, as it often must be. Now inasmuch as she might have escaped, had she been seaworthy, and at all events would have stood a better chance of doing so, a chance to the benefit of which the insurers were entitled, the assured fail to establish, by proof, a loss attributable wholly to a peril for which the underwriters are responsible. But if, in the same case, the loss was caused by a peril not attributable in any degree to the want of repair and consequent unseaworthiness — as if the vessel were struck with lightning and burnt, or taken by an enemy — then, notwithstanding the unseaworthiness, the underwriters would be responsible.

This doctrine, as to the duty of the owners to keep their vessel in a seaworthy condition during the voyage, and of the consequences of failing so to do, was much considered, and the principle sustained, in the circuit court of the United States, in the case of *Hazard* v. *New England Marine Ins. Co.* 1 Sumner, 218. A whaling vessel, bound on a long voyage into the Pacific Ocean, where it is known that a vessel is not safe from the attacks of worms, unless every part of her bottom is covered with copper, met with an injury at the Cape de Verd Islands, by which part of her false keel was knocked off. This damage was not repaired, but the vessel proceeded on her voyage into the Pacific Ocean, and was there destroyed by worms. The court decided, among other things, that if the damage thus done might have been repaired at Cape de Verd, or in Brazil, where the vessel stopped, and in consequence of such want of repair the worms obtained access to the keel and bottom of the vessel, the underwriters would not be liable ; because the loss would be attributable to the want of repair, which it was the

duty of the owners to have made. The cause afterwards came before the supreme court of the United States, 8 Pet. 557, and the point in question was fully argued. The court ordered a *venire facias de novo*, on another and distinct ground. They did not find it necessary to express any direct opinion upon the point in question, but ordered the case to a new trial, without expressing any disapprobation of the opinion of the circuit court on this point ; which may be considered as an affirmance of the doctrine of that court.

Upon these principles and authorities, we consider it a rule of the law of insurance, as settled here, that in addition to the implied warranty which applies to the state of the vessel at the commencement of the voyage, and must be strictly complied with as a condition precedent, it is the duty of the assured, from time to time during the voyage, to repair her and keep her in a suitable condition for the service in which she is engaged, and if they fail to do so, and a loss happens which is attributable to that cause, the assured, and not the underwriters, must sustain it And although there are some recent English cases which seem to wear a different aspect, or leave the point in doubt, yet, upon a full consideration and comparison, we are inclined to think they are not opposed to this doctrine.

Some confusion, perhaps, may have arisen from a slight am-biguity in the use of the word " seaworthiness." It might have contributed to greater clearness and certainty in the rules of law on this subject, if the word " seaworthiness," had been con-fined to the sense in which it is most commonly used ; that is, to designate the condition in which, by the well known implied warranty, every vessel must be at the commencement of the voyage, in order to be the subject of a contract of insurance, and if some other word or form of words had been used to de-scribe that state of equipment, preparation, and fitness for the exigencies of the voyage, in which it is the duty of the owners to keep and maintain their vessel, as far as it is in their power to do so, from time to time, during the whole progress of the voyage. But as the word is used in this double aspect, it is our duty to discriminate cautiously, and not apply the rules, affecting the

rights of parties, drawn from one species of unseaworthiness, to cases arising under the other.

But the general principle, as stated, seems to be consonant to the established principles of the law of insurance. The whole voyage is be conducted under the management of the owners, and they have many duties to perform, as well at the outset, as in the progress of the voyage. The master, consignees, and other persons employed are, to many purposes, their agents. Deviation, unjustifiable delay, and change of risk, are well known instances of cases where the underwriters are discharged and exempted from all succeeding perils, although the implied warranty has been complied with, and the policy has attached, and the insurers become bound. As where a vessel sails with an intention to deviate at a future stage of the voyage ; the underwriters are responsible for losses occurring before the vessel reaches the dividing point, and not for those which occur after. The doctrine of implied warranty of seaworthiness would go but a little way in securing the performance of the duties of the assured, because, as it has often been said, that warranty is complied with, if the vessel is seaworthy when she sails, although she becomes unseaworthy in twenty four hours after. But if it can be definitely settled what are the duties of the assured, in regard to the conduct of the voyage, after its inception, and to what extent they are responsible for the acts and the negligence of the master, officers and crew, and of all other persons who may have an agency in the navigation of the vessel and conduct of the voyage, it will be a question, in each particular case, whether the loss is one for the insurers or owners to bear. The modern cases go far to establish the rule, that for the conduct of the master or mariners, in the practical navigation, care and management of the vessel, after the commencement of the voyage, the insurers are responsible, provided the actual loss arise from one of the perils insured against, although such peril was occasioned or increased by the negligence, carelessness, bad seamanship, or other misconduct of the master and mariners, not amounting to barratry. As this question respecting liability for the mere negligence and carelessness of the master and mariners,

it will hereafter be perceived, arises in this case, and, as several of the cases to which I propose to refer bear upon both points, I will consider them together.

*Law* v. *Hollingsworth*, 7 T. R. 160, is often referred to, in the recent cases on both sides. The underwriters in that case were held not liable for a loss in the river Thames, because the pilot had been discharged before the ship came to anchor, and before the accident. The principle on which the cause was decided is not very distinctly stated. Lord Kenyon seems to place it on the ground of non-compliance with the implied warranty of seaworthiness. Mr. Justice Lawrence places it on that of gross negligence of the master. Park on Ins. (7th ed.) 347, puts it on the ground of implied condition. In some of the more recent cases, its authority is questioned, so far as it proceeds on the ground that the underwriters were discharged by the negligence of the master. *Dixon* v. *Sadler*, 5 Mees. & Welsb. 415. Treating it as a condition precedent, it would not cause the vessel to be unseaworthy in the usual sense, so as to prevent the policy from attaching, because it could not occur till long after the commencement of the voyage, and did in fact occur quite at the end of it.

In *Busk* v. *Royal Exchange Assurance Co.* 2 Barn. & Ald. 73, the loss was by fire, occasioned by the negligence of the mate in leaving the vessel with a fire in the cabin, the vessel lying frozen up in the ice in the gulf of Finland, and no person having been left on board. The defence was put on the ground, that there was a breach of an implied warranty, because the vessel was not properly manned, and because the loss was caused by the negligence of the mate, who was the agent of the assured. It was decided in favor of the assured on both points. In answer to the argument of breach of implied warranty, the court say, "the owner certainly is bound, *in the first instance,* to provide the ship with a competent crew ; but he does not undertake for the conduct of that crew in the subsequent part of the voyage." They reconcile it with *Law* v. *Hollingsworth*, by saying, that that case was decided on the ground that the ship had not on board a pilot, required by act of parliament.

In *Walker* v. *Maitland*, 5 Barn. & Ald. 171, it was held that a loss arising immediately from the perils of the sea, but remotely from the negligence of the master and mariners, is a loss within the policy. Abbott, C. J. says, there is no decided case in which the underwriters have been held to be excused in consequence of the loss having been remotely occasioned by the negligence of the crew. He says, " I am afraid of laying down any such rule ; it will introduce an infinite number of questions as to the quantum of care which, if used, might have prevented the loss. Suppose, for instance, the master were to send a man to the mast-head to look out, and he falls asleep, in consequence of which the vessel runs upon a rock, or is taken by the enemy ; in that case, it might be argued that the loss was imputable to the negligence of one of the crew, and that the underwriters were not liable." See *Bishop* v. *Pentland*, 7 Barn. & Cres. 219.

*Shore* v. *Bentall*, although it seems to have been a case of considerable interest and expectation, is found reported only in a note in 7 Barn. & Cres. 798. Lord Tenterden stated the opinion of the court to be, that the underwriters are responsible for the misconduct or negligence of the captain and crew ; but that the owner, as a condition precedent, is bound to provide a crew of competent skill. The facts on which this opinion was founded are not stated. *Phillips* v. *Headlam*, 2 Barn. & Adolph. 380, throws much light on the subject, as to the general question.

The case of *Hollingworth* v. *Brodrick*, 7 Adolph. & Ellis, 40, is very important to the present question. The decision turned upon the deficiency of the special plea. The defendant pleaded, that during the voyage the vessel became damaged and unseaworthy, and that the owner might and ought to have repaired her, &c. On demurrer, it was held that the plea was bad and insufficient, because it did not state that the non-repair caused the loss, or that the loss was occasioned by the alleged default. The case is too long to be stated here ; but taken together, I think it recognizes the doctrine, that if the vessel becomes unseaworthy during the voyage, and this is known to the

owner or captain, and he has it in his power to repair the damage, and fails to do so, and the loss arises from that cause, the underwriters would not be responsible for such loss.

The last case I propose to cite on this subject is *Dixon* v. *Sadler*, 5 Mees. & Welsb. 405. This also came before the court upon a plea, in which it was stated, that though the vessel was lost by perils of the sea, yet it was occasioned by the wilful, wrongful, negligent, and improper conduct of the master and mariners, not amounting to barratry, in throwing over so much of the ballast, that the vessel became unseaworthy, &c. The court held this a bad plea, and rendered judgment for the plaintiff, *non obstante veredicto.* Inasmuch as the vessel was seaworthy when the voyage commenced, and as the loss was immediately occasioned by the perils insured against, and as the state of unseaworthiness was occasioned by the subsequent negligence and misconduct of the master and mariners, for which the underwriters were responsible, the facts pleaded were held to be no defence. Mr. Baron Parke states it as the result of the modern cases, and as the opinion of the court, " that the absence, from any cause to which the owner was not privy, of the master or any part of the crew, or of the pilot, who may be considered as a temporary master, after they had been on board, must be on the same footing as the absence, from a similar cause, of any part of the necessary stores or equipments originally put on board. The great principle established by the more recent decisions is, that if the vessel, crew and equipments be originally sufficient, the assured has done all that he contracted to do, and is not responsible for the subsequent deficiency occasioned by any neglect or misconduct of the master or crew." If this is to be taken as limited to the cases where the master, officers and crew act in their own proper sphere, as practically managing and conducting the navigation, and where the master does not stand in the relation of representative and agent of the owners, we think it not inconsistent with the general principle, leaving the owner still bound by the acts of the master, so far as by law and the usage of navigation he is the representative of the owners, executing their express or implied orders, and doing

all such acts as an owner himself might and would do, if present. Unless taken with this implied limitation, the principle would seem to be laid down too broadly, and come in conflict with some of the established rules of insurance law.

It may be remarked, upon this review of the English authorities, that they mostly turn upon the question, whether there has been a breach of the implied warranty of seaworthiness, wholly exonerating the underwriters ; or, whether there has been negligence or mismanagement of the officers, pilots and mariners, originally competent in point of number, skill and capacity, in the performance of what may be considered their respective and appropriate professional duties. No case has gone the length of deciding, that where there is a long voyage consisting of several stages, or where there is a policy on time, which may last several years, if the vessel becomes damaged and unfit for navigation, it is not the duty of the owner to make the necessary repairs to fit her for the service on which she is destined, and in case of failure to do so, and a loss happens from that cause, that the insurers are liable, as for a loss by one of the perils insured against. Nor, we think, has any case decided, that in the absence of proof of any other provision for the performance of this duty, the captain shall not be presumed to be the agent of the owner for that purpose. If so, we think the English and American cases may be reconciled.

We will now proceed to a more particular consideration of the present case. It is agreed on all hands that a vessel must have a competent master and crew at the commencement of a voyage, to make her seaworthy, and render her a proper subject of insurance. This is an implied warranty, a condition precedent, without compliance with which, the policy does not attach and the contemplated contract does not take effect. And in one case, it was held that the crew must be shipped for the voyage, and that a vessel was not seaworthy which had a crew shipped for a part of the voyage only, in consequence of which, she was compelled to stop on the way, to land some of the seamen, and obtain others in their stead. *Forshaw* v. *Chabert*, 3 Brod. & Bing. 158. *S. C.* 6 Moore, 369. But the court, in their opin-

ion, rely on the consideration that this defect, constituting un-seaworthiness, existed at the commencement of the voyage insured, and therefore the implied warranty was not complied with. It was therefore a case, in which the policy did not attach.

In the present case, it is conceded, and the charge to the jury went on the assumption, that at the commencement of the voyage the vessel had a competent master, officers and crew , that the policy attached and covered the risk, in the early part of the voyage to Jamaica. The voyage insured was one entire voyage from the United States to Jamaica, and back to the United States ; and therefore the policy, having once attached, covered the whole voyage insured. So it was con sidered by the judge, and his direction went on the other ground, that although the vessel had a sufficient master, officers and crew, yet if the master became incapacitated to command the vessel, either by his own misconduct, as intemperance, or by the visitation of Providence, as sickness or insanity, the vessel thereby became unseaworthy. This direction, in the opinion of a majority of the court, was incorrect.

By the established rules of the maritime law, as adopted by all commercial nations, certainly by England and the United States, a vessel sent on a voyage to sea is not only to have a competent master, but a competent mate, whose duties and pow-ers are as distinctly defined and well established as those of the master. He is appointed by the owners, or by their authority ; he is the regular successor to the master, by the appointment of those who have the power of appointment, and by their substitu-tion becomes *de facto* master, in case of the death of the master first appointed, or of his sickness, or such other cause as shall render him incapable of having the command. It is, in effect, the prospective appointment of a master, to take effect in any of the exigencies which may require such appointment. In the case of *The Favourite*, 2 Rob. 237, that great judge of maritime law, Sir William Scott, says, the contract of the mate is, " not only that he shall perform the duties of mate, but also, by necessary implication of law, that he shall, in case of necessity

take upon himself also the duties of master ; for, by the maritime law, the mate is *hæres necessarius* to the employment of master, in case of necessity." S. P. 1 Sumner, 156, 157. Such being the nature of the contract and employment of a mate, it is to be presumed, that he is appointed with reference to his qualifications for this part of his duty. He must be qualified, in point of general capacity, for the office of master. *Robinett v. Ship Exeter*, 2 Rob. 261. He must be competently skilled in theoretic and practical navigation and general seamanship, for the duty of taking command in case of exigency.

And a vessel cannot be deemed seaworthy, which has not on board some person capable of navigating her, besides the master. In *Clifford* v. *Hunter*, 3 Car. & P. 16, and Mood. & Malk. 103, a vessel sailed from Madras with a captain, two mates, and a full crew of seamen. On the arrival of the ship at the Mauritius, the captain was very ill, and continued so ; notwithstanding which he set sail for England. On the next day his illness increased, and feeling incompetent to command the ship, he inquired if either of the other officers could navigate the vessel to England, found no one able, and put back towards the Mauritius to obtain one, and the vessel was lost. Lord Tenterden left it to the jury with a strong intimation of his opinion, that a vessel on so long a voyage could not be deemed seaworthy with no other person on board capable of navigating her except the master ; that therefore the return of the vessel to the Mauritius was an inexcusable deviation, which discharged the underwriters.

Upon this view of the duties of a mate, it appears that in the event supposed in the case at bar, there was a master competent to take the command, and therefore that in this respect the vessel was not unseaworthy when she left Jamaica. And we are of opinion, that this case is entirely distinguishable from that of *Paddock* v. *Franklin Ins. Co.* 11 Pick. 227. In that case, there was no substitute for the repairs, which might and ought to have been made at Pernambuco ; and in that case, and for the purpose of making those repairs, the captain of the vessel must be deemed to stand in the place of the owners, acting

under their orders, carrying with him their funds and their credit. But in the case supposed, on the death or incapacity of the captain, there is a substitute in the mate, who is master *de facto,* under the appointment of the owners. It is said that in the case of *Bryant* v. *Commonwealth Ins. Co.* 6 Pick. 131, it appeared that a new master had been appointed at Havana, by the correspondent of the owner. But it appears in that case, that the captain and mate had both died before such an appointment. Besides, it does not appear that the appointment had not been previously authorized or subsequently ratified by the owner ; and further, no question was ever made or decided as to the validity of the appointment. We think, therefore, that without impugning the authority of *Paddock* v. *Franklin Ins. Co.*, we may safely decide; that the vessel did not become unseaworthy by the utter incapacity of the master at Jamaica, and did not sail from that port in an unseaworthy condition.

It was mentioned in the early part of this opinion, that another question might be considered as raised on this report, though it is stated that the jury found their verdict for the defendants solely on the ground that the master became suddenly incompetent to command. The question alluded to is this ; whether, on the happening of the incompetency of the master, the mate was chargeable with misconduct and neglect of duty, in not taking the command ; and if so, whether on that ground the underwriters were discharged. It is stated in the report, that the judge, after having charged the jury that it was the duty of the assured to keep the vessel in a suitable state of equipment, added, " and consequently when the master became incompetent, it was the duty of the first mate to take the command of the vessel, and if resisted by the master, application should have been made to some competent authority to restrain the master, and to prevent the vessel from going to sea under his command ; that as this was not done, and as the master's incompetency continued until the time of the loss, it might be reasonably inferred, that the loss was the consequence of the master's mismanagement, for which the defendants were not responsible."

We perfectly agree with the learned judge, that it was the duty of the first mate, on the happening of the incompetency of the master, to take command of the vessel, and that he had a right to resort to all lawful means to aid him in the effectual establishment of his command. But the question relates to the consequences of his not doing so upon the respective rights of the owners and underwriters. We consider the effect of the instruction to the jury to be this ; that if the master became insane and wholly incapable of commanding the vessel, it was the duty of the mate to take the command, and that if this was not done, and the vessel was under the actual direction of the master, and was lost by means of his incapacity to command, the underwriters were not liable. By insanity, the master ceased to be a voluntary or responsible agent ; and any loss, caused by him in that state, must be deemed purely accidental, or providential. The true and real cause of such loss must be deemed to be the mistake, neglect, or other default of the mate, the rightful and legitimate commander in the case supposed, in not doing his duty. The efficient cause of the loss would be the want of skill, judgment and capacity, in the actual navigation of the vessel, in consequence of which she was stranded and lost by one of the perils insured against. If the underwriters are exonerated, then it must be on one of two grounds ; either that the vessel was not seaworthy, or that the loss was attributable to the mistake, neglect, or default of the mate. The first, we think, has been sufficiently considered ; and the question recurs, whether, if the loss be attributable to the latter cause, the underwriters would be discharged.

The mate, it is assumed and conceded, was competent to the performance of his duties at the commencement of the voyage, and continued so to the time of the loss. If the vessel had an officer on board competent to command, and whose duty it was to command, the vessel could not be deemed unseaworthy. Then the question is, was the mate guilty of culpable negligence or want of judgment, and if so, were the owners responsible for such negligence and want of judgment ? The facts upon which this part of the case depends do not seem to be fully reported .

nor were the jury specially instructed in matter of law on this point.   But as the subject has been necessarily discussed in connexion with the other question, and as it would be likely to arise upon another trial, we have thought it best to consider it.

It is very clear in this case, that the immediate cause of the loss was stranding in the night time, which is one of the perils insured against ; and the case supposed is, that this was occasioned by the default of the mate in not assuming the command. This default must consist, either in a want of judgment in perceiving and determining that the master had become so deranged or incapacitated as to authorize and require him to interpose, or in negligence in the performance of his duty, when the case occurred.   Such a case may occur in every voyage, and must be considered as one of the contingencies incident to navigation. It may often present questions of great difficulty, in acting on which, mistakes, on the part of the officer second in command, may occur.   But we cannot perceive why the duty of the mate was not of a purely official and professional character, growing out of his general powers and the relation in which he stood as an officer, and not devolving on him as the agent of the owners, in any other sense than that in which pilots and all other officers and mariners are their agents.   They are vested with certain powers, to be exercised for the use and benefit of owners, freighters, underwriters, and all others who are directly or remotely interested in the vessel and voyage.   I cannot distinguish the negligence of the mate, in the case supposed, from his failure in the performance of any other duty as a nautical man. Suppose a case of a loss by stranding, and it could be satisfactorily proved, that if, in a particular emergency, sail had been made or taken in, if an anchor had been carried out, or the vessel put on another tack, the disaster might have been avoided ; it would indicate a similar mistake of judgment or neglect of duty on the part of the commanding officer, as that in the case supposed.   In both cases, it is a mistake or neglect of his peculiar and appropriate duty as an officer and seaman.   For the performance of these duties, we are of opinion that the owners, as between themselves and the underwriters, are not responsible.

A contrary doctrine would lead to questions of great difficulty, involving numerous questions of fact, of very difficult proof, as to the skill and seamanship of all the nautical measures taken in the whole conduct of the voyage. Besides, these mistakes of judgment and instances of negligence are incident to navigation, and constitute a part of the perils that attend it ; and they can no more be restrained, prevented, or guarded against, by the owners, than by the underwriters. The most cautious foresight can only enable owners to provide a competent crew of officers and seamen at the commencement of the voyage. What reasons, then, are there of justice or policy, what considerations growing out of the nature of this contract, or the relations of the parties, which should prevent the owners from insuring themselves against this peril ?

This point seems now definitely settled by English courts, and the authorities cited, which were referred to above, as well with reference to this point as to that of warranty, are decisive upon this subject ; and it appears to us that there are very strong reasons in support of it. The same principle has been adopted and acted upon by the supreme court of the United States. *Patapsco Ins. Co.* v. *Coulter,* 3 Pet. 222. The point was again considered, and the same principle affirmed, in *Waters* v. *Merchants' Louisville Ins. Co.* 11 Pet. 213. Mr. Justice Story, in giving his judgment in the case of *Potter* v. *Suffolk Ins. Co.* 2 Sumner, 200, intimates that a contrary doctrine has been maintained in Massachusetts ; not, indeed, that it has been definitely so adjudged, but that such has been the course of opinion in this Commonweath ; and he cites several cases tending to that conclusion. *Brazier* v. *Clap,* 5 Mass. 1. The decision in that case was, that the underwriters were discharged by a deviation, not caused by necessity or innocent mistake. The deviation was at the outset of the voyage, and the court proceed on the ground that there was intentional departure from the usual course of the voyage, without justifiable cause, and so a deviation, or such gross ignorance and incompetency of the master at the time of sailing, as to show that the vessel was not seaworthy.

*Cleveland* v. *Union Ins. Co.* 8 Mass. 308, is a case certainly

much more in point. It was there held, that where the master carelessly left the ship's papers at the Isle of France, in consequence of which she was captured and sent in, and subjected to heavy expenses, the underwriters were not liable for the loss. In the first place, it may be remarked, that the cause was argued before three only of the five judges then composing the court. Parsons, C. J. and Thatcher, J. not being present, and of the three who heard the cause, one (Sewall, J.) dissented. He seems to have retained the opinion expressed at the trial, which was, that the insured were entitled to recover, notwithstanding the accident of leaving the vessel's papers at the Isle of France. But whatever may be considered the authority of that decision, it has not a very direct bearing on the present case. It was the case of a neutral vessel, detained by a bel ligerent. It is held, and so it was strongly argued in that case, that it is the duty of a neutral owner so to conduct his vessel and voyage on the high seas, as to entitle himself to the privileges and exemptions of the neutral character ; and for that purpose, he must at all times carry with him the usual and recognized evidence of his national character ; and if he fails to do so, he exposes himself to an increased risk, which the underwriters have not taken. Where the owner does not go himself, the master may perhaps be deemed his agent, to defend and protect his rights as such neutral owner, first, by carrying and exhibiting the proper evidence to prevent detention, and secondly, in case of detention, to claim and defend the rights of the owner.

*Ellery* v. *New England Ins. Co.* 8 Pick. 14, was the case of a vessel damaged on a marine railway, upon which she was about being placed for repairs. It seemed to be implied, in the opinion of the court, that if the accident, caused as it was by one of the perils insured against, was occasioned by the negligence of the master, it would have been a good defence. But such negligence was negatived by the evidence. Perhaps the opinion itself might have been warranted by the consideration, that the heaving out and repair of a vessel in a home port is not one of the ordinary duties of the master, devolving on him by his office ; but if employed in such service, he may be

deemed the special agent of the owner.   But in the same case, the court express an opinion, that for the negligence of the superintendent of the railway, the owners would not be responsible, any more than for the negligence of a pilot, for whose misconduct or neglect underwriters are liable.   *Carruthers* v. *Sydebotham*, 4 M. & S. 77.   The case of a mate and mariners is quite as analogous to that of a pilot or superintendent of a marine railway for the repair of vessels, as to that of a master. Each is a person necessarily employed by the owner to do certain services in and about the vessel, and on the voyage.

On the whole, we are satisfied that there is no decision in this Commonwealth which directly conflicts with the opinion to which we have come ; that it is recommended by very strong arguments from expediency, and from the principles of the law of insurance, and is supported by very great weight of judicial authority.   The court are therefore of opinion, that if it were proved, on another trial, that the mate in this case was chargeable with want of skill and judgment in not perceiving or determining, that on account of the master's having become incompetent to retain the command, it was his own right and duty to assume the command, or if it were proved that the mate was chargeable with neglect of duty in thus omitting to take the command, still the underwriters would not be exempt from a loss incurred by stranding, which was one of the perils insured against, although if the mate had judged and acted differently, as in the case supposed it was his duty to do, such loss might have been avoided.

WILDE, J.   With great deference to the opinion of my learned brethren, I am unable, after much deliberation, to concur with them in their decision.   This case cannot, I think, be distinguished from that of *Paddock* v. *Franklin Ins. Co.* 11 Pick. 227, in any material fact ; and without overruling that case, which appears to me founded on a sound principle of law, 1 cannot perceive on what ground the decision now made can be sustained.

The case of *Paddock* v. *Franklin Ins. Co.* was an action of assumpsit on a policy of insurance on the cargo on board the

ship Tarquin, on a whaling voyage in the Pacific Ocean. The ship, having returned round Cape Horn, touched at Pernambuco, and on her passage from that port for the United States, foundered at sea, and the whole property was lost. It was argued for the defendants in that case, that the ship was unseaworthy when she sailed from Pernambuco on her return passage, not being then in a competent state of repair and equipment ; and that her foundering at sea, without any stress of weather, or adequate cause from sea risk, was conclusive proof that her innavigability proceeded from age and decay, and want of repair, and not from any of the perils insured against. The jury, however, returned a verdict for the plaintiff, and on motion of the defendants, the verdict was set aside, and a new trial granted, on the ground that the ship, when she left Pernambuco, was not in a competent state of repair and equipment. The law on this point is laid down by the chief justice, as follows : " That the owner of a ship is bound to keep his ship in a competent state of repair and equipment, during the voyage, and that if damage is sustained in her hull, sails, or equipments, he is bound to repair and supply them as soon as he conveniently can ; that if the crew become disabled by the death, sickness, or desertion of the men, he shall, as soon as practicable, procure others, so that in a certain sense he is bound to keep his ship seaworthy is no doubt true." " And if this is not performed on his part, and if, in consequence of such non-performance, a loss happens, or by any reasonable probability may be ascribed to that cause, the effect will be, that such loss will fall on the assured, and not upon the underwriter."

The same doctrine is laid down by Story, J. in the case of *Hazard* v. *New England Marine Ins. Co.* 1 Sumner, 230. In that case, the ship had sustained an injury by the loss of her false keel at the Cape de Verd Islands, whereby she became exposed to the action of the worms, which obtained entrance into her in the Pacific Ocean, and destroyed her. The underwriters were held not liable, because it was the duty of the master to cause the ship to be repaired ; and in not doing so, he was guilty of negligence, which exonerated the underwriters

from the subsequent loss by worms. " If," says Story, J. " the master omitted to make such repairs because he did not deem them necessary, and if by such neglect alone the subsequent loss by worms was occasioned, the underwriters are not liable for the loss so occasioned."

The same principle of the law of insurance is admitted by the court, in *Hollingworth* v. *Brodrick*, 7 Adolph. & Ellis, 40. In that case the defendant pleaded, that during the time for which the ship was insured, and before the loss, she was damaged and unseaworthy, and that she might and ought to have been repaired and rendered seaworthy ; yet the plaintiff, well knowing the premises, did not repair and render her seaworthy. To this plea the plaintiff demurred, because it was not averred that the non-repair caused the loss. And for this reason the plea was adjudged insufficient. Lord Denman remarked, " I own I feel a doubt whether if it were distinctly averred that the ship had, by gross negligence been brought, during the voyage, to a condition in which she would not be insurable, that might not be a defence. It is certainly a new and perhaps a dangerous one ; but I think that if it were clearly made out, the assured could not say that the loss was by the perils insured against." If, then, the plea had averred that the loss was caused by the non-repair of the ship, the plea would have been held good ; so that the doctrine laid down in *Paddock* v. *Franklin Ins. Co.* is maintained by this case, and by that decided by Mr. Justice Story ; and I am not aware of any case in which a different doctrine has been maintained.

The loss of the Tarquin was occasioned by foundering at sea, in consequence of springing a leak ; and it was held that if this might be attributable to her sailing from Pernambuco in an unseaworthy condition, for want of repairs which it was the duty of the master to furnish, the underwriters were not liable. The decision, therefore, in *Paddock* v. *Franklin Ins. Co.* appears to me to apply, in all respects, to the present case. The instructions to the jury were conformable to the opinion of the court in that case, which was read to them for their guidance. The decision in that case was founded on two facts, namely, first, that the

Tarquin, when she left Pernambuco, was in want of repairs to render her seaworthy, which the master might and should have supplied ; and, second, that in consequence thereof the loss happened.

In the present case, the jury must have found, under the instructions, that the vessel, when she left Jamaica, was not in a competent state of equipment, and that the loss was caused by the incompetency and insanity of the master. And on both points the evidence was very strong in support of the verdict. That the vessel was not in a competent state of equipment, is very clear, unless it can be maintained that a vessel under the command of an insane master is to be considered as properly equipped.

The only distinction between the case of a ship not being sea worthy at the commencement of the voyage, and her sailing from an intermediate port in a like condition, is, that in the former case the policy does not attach, and the underwriter is not responsible, although the loss could by no possibility be caused by the defective state of the ship ; whereas, in the latter case, the policy having attached, the underwriters are liable for any loss insured against, unless it was occasioned by the want of repair, supplies, or equipment, which it was the duty of the master to furnish.

That the loss in the present case was thus occasioned is es tablished by the verdict, and cannot now be questioned. How, then, can we set aside this verdict without overruling the case of *Paddock* v. *Franklin Ins. Co.* ? The jury have now found the facts which the court thought ought to have been found in the former case. It is very clear, although a part only of the evidence has been reported, that the vessel, when she left Jamaica, was not in a proper state of equipment. The question, then, is reduced to this ; was it in the power of the owner, or his agent, to put the vessel in a competent state of equipment ? This is a question of fact which is not raised by the report. The evidence is not fully reported, and I am clearly of opinion, that if the jury had returned a verdict for the plaintiff on this point, it ought to be set aside as a verdict against evidence.

Copeland & others *v.* New England Marine Ins. Co.

When the master became incompetent, it was the duty of the mate to assume the command of the vessel, and if the master had attempted to resist him by force and violence, he might have commanded the assistance of the crew, and they would have been bound to obey him ; or he might have made an application to the local authorities for the preservation of the peace. The master having become incompetent by reason of his insanity, had no right to the command of the vessel until he should be restored to his reason and competency. He had no more right to the command than a stranger. It was therefore the duty of the mate to assume the command, and to appoint a new mate, unless the owner, or his agent at Jamaica, chose to appoint a new master. Whether the owner had an agent at Jamaica authorized to act for him, does not appear ; but if he had not, it was incumbent on him to prove it. If he was bound to put the vessel in a safe condition, he must do it, or prove that it was not in his power so to do.

That the owner's agent or consignee might appoint a new master, if it were necessary, I cannot doubt. But I do not rely on this consideration, because I think it clear, that when the master became incompetent, it was the duty of the mate to take the command of the vessel. He would then have become the agent of the assured, and it would have been his duty to put the vessel in a proper state of equipment, by appointing a new mate, in like manner as the owner would have been bound to do, if he had been present.

It appears to me, therefore, that there is no valid exception to the instructions to the jury, and that the defendants are entitled to judgment on the verdict.

*New trial granted.*